Raymond J. Tittmann, No. 191298
raymond.tittmann@emhllp.com
**EDISON, McDOWELL & HETHERINGTON LLP**
401 Wilshire Blvd, 12th Floor Penthouse,
Santa Monica CA 90401
Telephone: 310.496.4553
Facsimile: 510.628.2146

Tyson A. Burns No. 306660
tyson.burns@emhllp.com
**EDISON, McDOWELL & HETHERINGTON LLP**
1 Kaiser Plaza, Suite 340
Oakland, CA 94612
Telephone: 510.628.2145
Facsimile: 510.628.2146

Attorneys for Plaintiff
FIRST MERCURY INSURANCE COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIRST MERCURY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>MILLENNIUM PRODUCTS, INC. d/b/a GT'S KOMBUCHA AND SYNERGY DRINKS; WHOLE FOODS MARKET CALIFORNIA, INC.,<br><br>Defendants. | Case No. 2:16-cv-03148<br><br>**PLAINTIFF FIRST MERCURY INSURANCE COMPANY'S COMPLAINT FOR DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: May 6, 2016 |

Plaintiff First Mercury Insurance Company ("First Mercury"), represented by the undersigned attorneys, alleges as follows:

## I. INTRODUCTION

1. By way of this Complaint, First Mercury seeks a declaratory judgment that: First Mercury does not have a duty to defend or indemnify Defendants Millennium Products, Inc. d/b/a GT's Kombucha and Synergy Drinks ("Millennium") and Whole Foods Markets California, Inc. ("Whole Foods") (collectively, the "Underlying

Defendants") in connection with a related underlying putative class action ("Underlying Lawsuit"), because, among other reasons, the Underlying Lawsuit does not seek damages as required for coverage under the First Mercury insurance policies described herein.

## II. THE PARTIES

2. First Mercury is, and at all relevant times was, a corporation incorporated in the State of Delaware with its principal place of business in the State of Michigan. At all times relevant, First Mercury was and is an approved foreign surplus lines insurer in California, and is transacting, the business of insurance in California, where Millennium is located and the First Mercury policies at issue were entered and issued.

3. First Mercury is informed and believes that Defendant Millennium is a corporation organized under the laws of the State of California, having its principal place of business in Vernon, California, within the jurisdiction of this district.

4. First Mercury is informed and believes that Defendant Whole Foods is a corporation organized under the laws of the State of California, having its principal place of business in Austin, Texas.

## III. JURISDICTION AND VENUE

5. The Court has personal jurisdiction over all defendants to this action because they are either citizens of the State of California or have purposefully availed themselves of the State of California by committing such acts and omissions within the State of California such that they could reasonably expect to have court actions filed against them within the jurisdiction, sufficient to satisfy 28 U.S.C. § 1331.

6. The Court has jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000, exclusive of interest and costs, and under Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202 which grant the United States District Courts jurisdiction to declare the "rights and other legal relations of any interested party making such a declaration, whether or not further relief is or could be sought."

7. Venue is proper for this action pursuant to 28 U.S.C. § 1391 because "a

substantial part of the events or omissions giving rise to this claim" for declaratory relief occurred within the Central District of California.

8. In particular, the insurance policies were issued in this District in California and are governed by California law.

## IV. FACTUAL BACKGROUND

### A. Millennium is a Manufacturer and Distributor of Kombucha Beverages

9. Millennium is in the business of manufacturing, marketing and distributing various kombucha beverages.

10. As a general matter, kombucha is a beverage produced by fermenting sweetened tea with a culture of yeast and bacteria.

11. Whole Foods is a supermarket chain engaged in the retail sale of products, including various kombucha beverages manufactured by Millennium.

12. First Mercury is informed and believes that Millennium and Whole Foods are parties to a Supplier Representations and Indemnification Agreement, under which Millennium, as the supplier of goods to Whole Foods, agrees to indemnify Whole Foods from and against any and all losses arising out of Millennium's products.

### B. The First Mercury Policies Issued to Millennium Cover Claims Seeking Damages as a Result of Bodily Injury or Property Damage

13. First Mercury issued a commercial general liability policy to Millennium as named insured under policy number CA-CGL-0000016581-02, effective September 7, 2013 to September 7, 2014.

14. First Mercury renewed the policy the following year under policy number CA-CGL-0000016581-03, effective September 7, 2014 to September 7, 2015. A true and correct copy of the Policy is attached as Exhibit A. Both policies utilize the same relevant policy coverage form, and are referred to collectively herein as the "Policies."

15. The insuring agreement of the Policies provides as follows:

Insuring Agreement

a. We will pay those sums that the insured becomes legally

> obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> (1) The amount we will pay for damages is limited as described in Section Ill – Limits Of Insurance; and
>
> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments- Coverages A and B.

16. As this provision sets forth, coverage for commercial general liability is limited to sums the insured becomes obligated to pay "as damages," and First Mercury's duty to defend arises only in suits against the insured seeking those damages.

17. The term "damages" refers to monetary compensation for a loss or detriment suffered through the wrongful acts of another.

18. In addition, the Policies contain an Endorsement titled "Exclusion – Punitive or Exemplary Damages," which provides that the insurance afforded under the Policies "does not apply to any claim for punitive or exemplary damages, fines or penalties imposed by law, restitution or any damages which are a multiple of, or in addition to, compensatory damages including related interest or costs whether or not such damages, related interest or costs are characterized as punitive or exemplary damages."

**C. The Policies Do Not Provide Coverage for the Underlying Lawsuit**

19. On November 17, 2015, Nina Pedro and Rosalind Lewis (the "Underlying

Plaintiffs") sued Millennium and Whole Foods in a putative class action in the United States District Court for the Northern District of California captioned *Nina Pedro, et al. v. Millennium Products, Inc., et al.*, Case Number 3:15-cv-05253 (the "Underlying Lawsuit"). A true and correct copy of the complaint filed in the Underlying Lawsuit is attached as Exhibit B.

20. The Underlying Plaintiffs allege the various kombucha beverages manufactured by Millennium suffer from numerous product defects.

21. According to the Underlying Plaintiffs, Millennium's kombucha beverages undergo a secondary fermentation process, which occurs post-distribution in the bottle and cannot safely be controlled.

22. The Underlying Plaintiffs allege this secondary fermentation process causes an uncontrolled buildup of carbon dioxide in the bottle, which may cause bottles of kombucha to explode, leak, spray uncontrollably upon opening, and/or have caps too tight to safely open. In addition, the Underlying Plaintiffs allege the secondary fermentation process produces alcohol, which causes certain bottles of kombucha to contain alcohol in excess of 0.05%.

23. The Underlying Plaintiffs allege the product defects pose potential and actual dangers to consumers in the form of product spoilage, loss, damage to property caused by the uncontrolled explosion or spraying of kombucha, and physical injury caused by exploding or broken bottles and/or the unintentional ingestion of alcohol.

24. The Underlying Plaintiffs seek to represent the following class in three causes of action arising from the alleged product defects:

> All consumers in the United States who purchased at retail for personal, family or household purposes, and not for resale, within two years before the date this suit was filed, any of the kombucha products manufactured by Defendants.

(Ex. A at ¶ 113.)

25. The first cause of action is for breach of the California Consumer Warranty Act, and the Underlying Plaintiffs request restitution and injunctive relief, as well as costs

of litigation and attorney's fees. (Ex. A at ¶ 132.)

26. The second cause of action is for violations of the California Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq*.), and the Underlying Plaintiffs request restitution and injunctive relief, as well as costs of litigation. (Ex. A at ¶ 141.)

27. The third cause of action is for violations of the California Consumer Legal Remedies Act (Civil Code § 1750 *et seq*.), and the Underlying Plaintiffs request injunctive relief, as well as costs of litigation and attorney's fees. (Ex. A at ¶¶ 147-148.)

28. Although the complaint in the Underlying Action alleges as background information that members of the proposed class suffered bodily injury and/or property damages as a result of the allegedly defective kombucha products, the complaint does not seek compensatory damages for any such loss or injury.

29. Instead, the complaint in the Underlying Action seeks civil penalties, such as attorneys' fees, disgorgement and restitutionary remedies for violation of California Business & Professions Code section 17200.

30. Such civil penalties are not 'damages' even potentially covered under the Policies. *See, e.g., Big 5 Sporting Goods Corp. v. Zurich American Ins. Co.*, 957 F.Supp.2d 1135, 1155 (C.D. Cal. 2013) aff'd, 2015 WL 8057228, , No. 13-56249 (9th Cir., Dec. 7, 2015).

31. In addition, the Policies expressly exclude coverage for the punitive and/or exemplary damages sought in the Underlying Action.

32. The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been wrongfully obtained. Under California law, one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Such orders do not award "damages" as that term is used in insurance policies." *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1266 (1992).

33. Therefore, nothing in the complaint in the Underlying Action alleges or can allege any form of relief that constitutes "damages" under the Policies. First Mercury has

no duty to defend or indemnify Millennium, Whole Foods, or any other defendant in the Underlying Lawsuit.

**FIRST CAUSE OF ACTION**

(Declaratory Relief)

34. First Mercury incorporates each and every allegation of the preceding paragraphs, 1-33, as if set forth herein.

35. An actual controversy now exists between First Mercury and all Defendants as to whether First Mercury owes defense and/or indemnity with respect to the Underlying Lawsuit.

36. First Mercury seeks a declaration as to whether it owes defense and/or indemnity under the Policies with respect to the Underlying Lawsuit.

37. In particular, First Mercury seeks declarations as follows:

a. That the Policies do not provide coverage for the defendants in the Underlying Lawsuit because the Underlying Lawsuit does not seek damages and is thus outside the scope of the Policies' insuring agreement.

b. That First Mercury owes no duty to defend to Millennium, Whole Foods, or any other defendants in the Underlying Lawsuit.

c. That First Mercury owes no duty to settle to Millennium, Whole Foods, or any other defendants in the Underlying Lawsuit.

d. That First Mercury owes no duty to indemnify to Millennium, Whole Foods, or any other defendants in the Underlying Lawsuit.

e. That any other policies issued by First Mercury to Defendants to not impose any coverage obligations with respect to the Underlying Lawsuit.

38. First Mercury also seeks a declaration as to any other terms and conditions in the Policies that preclude or limit coverage with respect to the Underlying Lawsuit.

39. Wherefore First Mercury seeks declaratory relief, costs, and all other relief permitted by law.

///

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), First Mercury requests trial by jury on all issues for which it is entitled to a jury.

Dated: May 6, 2016

EDISON, McDOWELL & HETHERINGTON LLP

By: /s/ Raymond J. Tittmann
Raymond J. Tittmann
Tyson A. Burns

Attorneys for Plaintiff
FIRST MERCURY INSURANCE COMPANY

# EXHIBIT A

(The Attaching Clause need be completed only when this endorsement is issued subsequent to preparation of the policy.)

# ENDORSEMENT

This endorsement, effective on 9/7/2014 (DATE) at 12:01 A.M. standard time, forms a part of

Policy No. CA-CGL-0000016581-03 of the First Mercury Insurance Company (NAME OF INSURANCE COMPANY)

Issued to GTs Kombucha (DBA)

By CoverX SpecialtyInsurance Services
California License No. 0G00727

Authorized Representative

IT IS HEREBY UNDERSTOOD AND AGREED THAT THE NAMED INSURED SHALL READ AS FOLLOWS:

Millennium Products Inc
DBA: Synergy Drinks
DBA: GT's Kombucha

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NAMED INSURED/ADDRESS/ADDITIONAL INSURED CHANGES - ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**

The following named insured/addresses/additional insured changes are made as follows:

It is hereby agreed and understood that the following Named Insured has been added to the policy:

DBA: Synergy Drinks

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent or preparation of the Policy.)

Endorsement effective 09/07/2014 Policy No. CA-CGL-0000016581-03 Change No. 1

Named Insured Millennium Products Inc (DBA) GTs Kombucha

Countersigned by ______________________
(Authorized Representative)

# FIRST MERCURY INSURANCE COMPANY

(A STOCK COMPANY)

**STATUTORY HOME OFFICE: 200 SOUTH WACKER DRIVE, SUITE 2390, CHICAGO, IL 60606**
**ADMINISTRATIVE OFFICE: 26600 TELEGRAPH RD., SOUTHFIELD, MI 48033**

## GENERAL LIABILITY POLICY
## RENEWAL DECLARATIONS

*Serviced by:* CoverX Specialty Insurance Services

**POLICY NUMBER** CA-CGL-0000016581-03
**RENEWAL OF:** CA-CGL-0000016581-02

| **NAMED INSURED AND MAILING ADDRESS** | **BROKER NAME AND ADDRESS** |
|---|---|
| Millennium Products Inc (DBA) GTs Kombucha<br><br>4646 Hampton St<br>Vernon, CA 90058 | R T Specialty of Ca Ins Services LLC - La Jolla<br><br>7979 Ivanhoe Ave #325<br>La Jolla, CA 92037 |

**POLICY PERIOD** From: 9/7/2014 To: 9/7/2015
AT 12:01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**LIMITS OF INSURANCE:** *Defense Costs are outside the limits of Liability*

| | | | |
|---|---|---|---|
| Each Occurrence Limit: | $1,000,000 | Employee Benefits Liability: | Excluded |
| Personal & Advertising Injury Limit: | $1,000,000 | Employee Benefits Aggregate Limit: | Excluded |
| General Aggregate Limit: | $2,000,000 | Liquor Liability Limit: | Excluded |
| Products-Completed Operations Aggregate Limit: | $2,000,000 | Liquor Liability Aggregate: | Excluded |
| Damage To Premises Rented To You: | $50,000 | | |
| Medical Payment Limit: | Excluded | | |

**RETAINED LIMIT:** See form FMIC GL 2015 (01/14)

**PREMIUM COMPUTATION:** Premium: $83,700

Coverage for certified acts of terrorism has been rejected; exclusion attached. [X]
(Per TRIA Disclosure Notice.)

**DEPOSIT PREMIUM:** $83,700

**DESCRIPTION OF BUSINESS:** Beverage Bottler-soft drinks-not carbonated-in bottles or cans

FORM OF BUSINESS:

- [ ] INDIVIDUAL
- [ ] JOINT VENTURE
- [ ] PARTNERSHIP
- [ ] LIMITED PARTNERSHIP
- [ ] LIMITED LIABILITY COMPANY
- [X] ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY COMPANY)

**ENDORSEMENTS ATTACHED TO THIS POLICY:** See Schedule FMIC-END - Schedule of Forms and Endorsements

**"This insurance is issued pursuant to the CA Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner."**

**IMPORTANT! Please carefully examine your policy as it may contain significant coverage modifications or exclusions. If this policy is a renewal, it may not contain the same precise terms and conditions as the prior policy.**

**Date:** 9/15/2014 **Authorized Representative:** [signature]

THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.

# EXTENSION OF DECLARATIONS

Policy Number: CA-CGL-0000016581-03

**Location of Premises:**

Schedule of Locations on File with Company

**Classification and Premium:**

| Exposure Basis | Exposure Amount | Rate | Deposit Premium |
|---|---|---|---|
| Gross Sales | $18,000,000 | $4.6500/Per $1,000 of Gross Sales | $83,700 |

Insured: GT's Kombucha (DBA)

Policy Number: CA-CGL-0000016581-03

# SCHEDULE OF FORMS AND ENDORSEMENTS

(other than applicable forms shown elsewhere in the policy)

Forms and Endorsements applying to and made part of this policy at the time of issuance:

CG 00 01 (12/07) - COMMERCIAL GENERAL LIABILITY COVERAGE FORM
IL 00 17 (11/98) - COMMON POLICY CONDITIONS
FMIC LEGAL (04/14) - SERVICE OF SUIT
CG 00 68 (05/09) - RECORD AND DISTRIBUTE OF MATERIAL IN VIOLATION
CG 04 36 (12/04) - LIMITED PRODUCT WITHDRAWAL EXPENSE ENDORSEMENT
CG 20 11 (04/13) - AI - MANAGERS OR LESSORS OF PREMISES
CG 21 33 (11/85) - EXCLUSION - DESIGNATED PRODUCTS
CG 21 35 (10/01) - EXCLUSION - COVERAGE C - MEDICAL PAYMENTS
CG 21 47 (12/07) - EMPLOYMENT RELATED PRACTICES EXCLUSION
CG 21 49 (09/99) - TOTAL POLLUTION EXCLUSION ENDORSEMENT
CG 22 43 (07/98) - EXCL - ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL
CG 24 04 (05/09) - WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS
CG 31 31 (12/04) - FUNGI OR BACTERIA EXCLUSION
CG 31 67 (12/04) - EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS
D 2 (07/11) - NOTICE TO CALIFORNIA INSUREDS
FMIC GL 2010 (01/14) - CROSS SUITS ENDORSEMENT
FMIC GL 2011 (04/11) - CONTINUOUS OR PROGRESSIVE INJURY AND DAMAGE EXCL
FMIC GL 2015 (01/14) - POLICY DEDUCTIBLE ENDORSEMENT
FMIC GL 2077 (04/11) - HAZARDOUS MATERIALS EXCLUSION
FMIC GL 2088 (02/12) - EXCLUSION - PUNITIVE OR EXEMPLARY DAMAGES
FMIC GL 2090 (07/12) - AIRCRAFT PRODUCTSAND AIRCRAFT GROUNDING EXCLUSION
FMIC GL 2105 (01/12) - PRIOR INJURY OR DAMAGE CLAIMS MADE COVERAGE ENDST
FMIC GL 2152 (07/11) - SUBSIDENCE EXCLUSION
FMIC GL 2163 (05/12) - MINIMUM EARNED PREMIUM ENDORSEMENT
FMIC GL 2172 (07/11) - EXCLUSION OF TERRORISM
FMIC GL 2227 (12/11) - AI - VENDORS AUTOMATIC STATUS WHEN REQ IN AGREEMENT
FMIC GL 2261 (05/12) - EXCL - DESIGNATED PHARMACEUTICAL AND NUTRITIONAL
IL 00 21 (09/08) - NUCLEAR ENERGY LIAB EXCL ENDST
FMIC CLAIM NOTIFICATION (12/2006)

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © ISO Properties, Inc., 2006 

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © ISO Properties, Inc., 2006 

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".


© ISO Properties, Inc., 2006

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;


© ISO Properties, Inc., 2006

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

 © ISO Properties, Inc., 2006 

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web-sites for others; or

 © ISO Properties, Inc., 2006 

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.


© ISO Properties, Inc., 2006

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).


© ISO Properties, Inc., 2006

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and


© ISO Properties, Inc., 2006

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.


© ISO Properties, Inc., 2006

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".


© ISO Properties, Inc., 2006

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

 © ISO Properties, Inc., 2006 

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

 © ISO Properties, Inc., 2006 

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and


© ISO Properties, Inc., 2006

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

 © ISO Properties, Inc., 2006 

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections And Surveys**

1. We have the right to:
   a. Make inspections and surveys at any time;
   b. Give you reports on the conditions we find; and
   c. Recommend changes.
2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
   a. Are safe or healthful; or
   b. Comply with laws, regulations, codes or standards.
3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.
4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

**F. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.


Copyright, Insurance Services Office, Inc., 1998

# SERVICE OF SUIT

The Company agrees that in the event of its failure to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

The Company hereby designates the Commissioner, Director or Superintendent of Insurance, or other officer specified by law for that purpose, or his successor or successors in office, or the person designated below, in the space indicated, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured arising out of this contract of insurance. It is further agreed that the Company shall abide by the final decision of any court having jurisdiction in which such action is filed, or by the decision of any appellate court in the event of an appeal.

Upon receipt of process served hereunder, the Company hereby designates Wendy Drum, Legal Department, 26600 Telegraph Road, Southfield, Michigan 48033 as the person to whom the officer designated above is authorized to mail such process.

In the alternative, process may be served upon the authorized agent of the Company whose name and address are:

**FIRST MERCURY INSURANCE COMPANY**
**26600 TELEGRAPH RD.**
**SOUTHFIELD, MICHIGAN 48033**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** of Paragraph **2. Exclusions** of Section **I – Coverage A Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** of Paragraph **2. Exclusions** of Section **I – Coverage B Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITED PRODUCT WITHDRAWAL EXPENSE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| | **Limits Of Insurance** |
|---|---|
| Aggregate Limit | $ 25,000 |
| Deductible Amount Per Product Withdrawal | $ 10,000 |
| Participation Percentage Per Product Withdrawal | 0 % |
| Cut-Off Date 09/07/2013 | |

**THIS ENDORSEMENT ONLY PROVIDES REIMBURSEMENT TO YOU FOR EXPENSES INCURRED BECAUSE OF A COVERED "PRODUCT WITHDRAWAL". THIS ENDORSEMENT DOES NOT PROVIDE ANY LIABILITY COVERAGE OR COVERAGE FOR THE COST OR EXPENSE OF DEFENDING ANY CLAIM OR SUIT.**

**A.** The following is added to **Section I – Coverages:**

**SECTION I – LIMITED PRODUCT WITHDRAWAL EXPENSE COVERAGE**

**1. Insuring Agreement**

**a.** We will reimburse you for "product withdrawal expenses" incurred by you because of a "product withdrawal" to which this insurance applies.

The amount of such reimbursement is limited as described in Section **III** – Limits Of Insurance. No other obligation or liability to pay sums or perform acts or services is covered.

**b.** This insurance applies to a "product withdrawal" only if the "product withdrawal" is initiated in the "coverage territory" during the policy period because:

**(1)** You determine that the "product withdrawal" is necessary; or

**(2)** An authorized government entity has ordered you to conduct a "product withdrawal".

**c.** We will reimburse "product withdrawal expenses" only if:

**(1)** The expenses are incurred within one year of the date the "product withdrawal" was initiated;

**(2)** The expenses are reported to us within one year of the date the expenses were incurred; and

**(3)** The product that is the subject of the "product withdrawal" was produced after the Cut-Off Date designated in the Schedule.

**d.** The initiation of a "product withdrawal" will be deemed to have been made only at the earliest of the following times:

**(1)** When you first announced, in any manner, to the general public, your vendors or to your employees (other than those employees directly involved in making the determination) your decision to conduct or participate in a "product withdrawal". This applies regardless of whether the determination to conduct a "product withdrawal" is made by you or is requested by a third party; or

 © ISO Properties, Inc., 2003 

**(2)** When you first received, either orally or in writing, notification of an order from an authorized government entity to conduct a "product withdrawal.

**e.** "Product withdrawal expenses" incurred to withdraw "your products" which contain the same or substantially similar "defects" will be deemed to have arisen out of the same "product withdrawal".

**2. Exclusions**

This insurance does not apply to "product withdrawal expenses" arising out of:

**a. Breach Of Warranty And Failure To Conform To Intended Purpose**

Any "product withdrawal" initiated due to the failure of "your product" to accomplish their intended purpose, including any breach of warranty of fitness, whether written or implied. This exclusion does not apply if such failure has caused or is reasonably expected to cause "bodily injury" or physical damage to tangible property other than "your product".

**b. Infringement Of Copyright, Patent, Trade Secret, Trade Dress Or Trademark**

Any "product withdrawal" initiated due to copyright, patent, trade secret, trade dress or trademark infringements.

**c. Deterioration, Decomposition Or Chemical Transformation**

Any "product withdrawal" initiated due to transformation of a chemical nature, deterioration or decomposition of "your product". This exclusion does not apply if it is caused by:

**(1)** An error in manufacturing, design, or processing;

**(2)** Transportation of "your product"; or

**(3)** "Product tampering".

**d. Goodwill, Market Share, Revenue, Profit Or Redesign**

The costs of regaining goodwill, market share, revenue or "profit" or the costs of redesigning "your product".

**e. Expiration Of Shelf Life**

Any "product withdrawal" initiated due to expiration of the designated shelf life of "your product".

**f. Known Defect**

A "product withdrawal", initiated because of a "defect" in "your product" known to exist by the Named Insured or the Named Insured's "executive officers", prior to the date when this Coverage Part was first issued to you or prior to the time "your product" leaves your control or possession.

**g. Otherwise Excluded Products**

A recall of any specific products for which "bodily injury" or "property damage" is excluded under Coverage **A** – Bodily Injury And Property Damage Liability by endorsement.

**h. Governmental Ban**

A recall when "your product" or a component contained within "your product" has been:

**(1)** Banned from the market by an authorized government entity prior to the policy period; or

**(2)** Distributed or sold by you subsequent to any governmental ban.

**i. Defense Of Claim**

The defense of a claim or "suit" against you for liability arising out of a "product withdrawal".

**j. Third Party Damages, Fines And Penalties**

Any compensatory damages, fines, penalties, punitive or exemplary or other non-compensatory damages imposed upon the insured.

**k. Pollution-Related Expenses**

Any loss, cost or expense due to any:

**(1)** Request, demand, order, statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 © ISO Properties, Inc., 2003 

**B.** For the purposes of this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** "Product withdrawals" initiated; or

**c.** Number of "your products" withdrawn.

**2.** The Aggregate Limit is the most we will reimburse you for the sum of all "product withdrawal expenses" incurred for all "product withdrawals" initiated during the policy period.

**3. Deductible And Participation Percentage Provisions**

**a. Deductible**

We will only pay for the amount of "product withdrawal expenses" which are in excess of the deductible amount, if any, shown in the Schedule of this endorsement. The deductible applies separately to each "product withdrawal". The limits of insurance will not be reduced by the amount of this deductible.

We may, or will if required by law, pay all or any part of any deductible amount, if applicable, to effect settlement of any claim or "suit". Upon notice of our payment of a deductible amount, you shall promptly reimburse us for the part of the deductible amount we paid.

**b. Participation Percentage**

If a Participation Percentage is indicated in the Schedule of this endorsement, the following provision applies:

You agree to participate in the payment of "product withdrawal expenses" which are in excess of the Deductible, to the extent of the Participation Percentage indicated in the Declarations. The Participation Percentage will apply separately to each "product withdrawal".

You also agree that the cost of your participation in the loss will be borne entirely by you when due and you will not obtain insurance to cover it.

The Limits of Insurance of Product Withdrawal Expense Coverage apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**C.** For the purposes of this endorsement, the **Duties In The Event Of Occurrence, Claim Or Suit Condition** under **Section IV – Conditions** is replaced by the following:

**2. Duties In The Event Of A "Defect" Or A "Product Withdrawal"**

**a.** You must see to it that we are notified as soon as practicable of any actual, suspected or threatened "defect" in "your product", or any governmental investigation, that may result in a "product withdrawal". To the extent possible, notice should include:

**(1)** How, when and where the "defect" was discovered;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature, location and circumstances of any injury or damage arising out of use or consumption of "your product".

**b.** If a "product withdrawal" is initiated, you must:

**(1)** Immediately record the specifics of the "product withdrawal" and the date it was initiated; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the "product withdrawal" as soon as practicable.

**c.** You must promptly take all reasonable steps to mitigate the expenses associated with a "product withdrawal". Any "profit" that you receive from mitigating the expenses will be deducted from the amount of reimbursement that you will receive for "product withdrawal expenses".


© ISO Properties, Inc., 2003

**d.** You and any other involved insured must:

**(1)** Immediately send us copies of pertinent correspondence received in connection with the "product withdrawal";

**(2)** Authorize us to obtain records and other information; and

**(3)** Cooperate with us in our investigation of the "product withdrawal".

**D.** For the purposes of this endorsement, the following condition is added to **Section IV – Conditions:**

**Concealment Or Fraud**

We will not provide coverage under Section **I** of this endorsement to you, or any other insured, who at any time:

**1.** Engaged in fraudulent conduct; or

**2.** Intentionally concealed or misrepresented a material fact concerning a "product withdrawal" or "product withdrawal expenses" incurred by you under Section **I** of this endorsement.

**E.** The following definitions are added to the **Definitions** Section:

**1.** "Defect" means a defect, deficiency or inadequacy that creates a dangerous condition.

**2.** "Product tampering" is an act of intentional alteration of "your product" which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".

When "product tampering" is known, suspected or threatened, a "product withdrawal" will be limited to those batches of "your product" which are known or suspected to have been tampered with.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**3.** "Product withdrawal" means the recall or withdrawal:

**a.** From the market; or

**b.** From use by any other person or organization;

of "your products", or products which contain "your products", because of known or suspected "defects" in "your product", or known or suspected "product tampering", which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**4.** "Product withdrawal expenses" means those reasonable and necessary extra expenses, listed below, paid and directly related to a "product withdrawal":

**a.** Costs of notification;

**b.** Costs of stationery, envelopes, production of announcements and postage or facsimiles;

**c.** Costs of overtime paid to your regular non-salaried employees and costs incurred by your employees, including costs of transportation and accommodations;

**d.** Costs of computer time;

**e.** Costs of hiring independent contractors and other temporary employees;

**f.** Costs of transportation, shipping or packaging;

**g.** Costs of warehouse or storage space; or

**h.** Costs of proper disposal of "your products", or products that contain "your products", that can not be reused, not exceeding your purchase price or your cost to produce the products.

5. **"Profit" means the positive gain from business operation after subtracting for all expenses**

 © ISO Properties, Inc., 2003 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITED PRODUCT WITHDRAWAL EXPENSE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| | **Limits Of Insurance** |
|---|---|
| Aggregate Limit | $ 25,000 |
| Deductible Amount Per Product Withdrawal | $ 10,000 |
| Participation Percentage Per Product Withdrawal | 0 % |
| Cut-Off Date 09/07/2013 | |

**THIS ENDORSEMENT ONLY PROVIDES REIMBURSEMENT TO YOU FOR EXPENSES INCURRED BECAUSE OF A COVERED "PRODUCT WITHDRAWAL". THIS ENDORSEMENT DOES NOT PROVIDE ANY LIABILITY COVERAGE OR COVERAGE FOR THE COST OR EXPENSE OF DEFENDING ANY CLAIM OR SUIT.**

**A.** The following is added to **Section I – Coverages:**

**SECTION I – LIMITED PRODUCT WITHDRAWAL EXPENSE COVERAGE**

**1. Insuring Agreement**

**a.** We will reimburse you for "product withdrawal expenses" incurred by you because of a "product withdrawal" to which this insurance applies.

The amount of such reimbursement is limited as described in Section **III** – Limits Of Insurance. No other obligation or liability to pay sums or perform acts or services is covered.

**b.** This insurance applies to a "product withdrawal" only if the "product withdrawal" is initiated in the "coverage territory" during the policy period because:

**(1)** You determine that the "product withdrawal" is necessary; or

**(2)** An authorized government entity has ordered you to conduct a "product withdrawal".

**c.** We will reimburse "product withdrawal expenses" only if:

**(1)** The expenses are incurred within one year of the date the "product withdrawal" was initiated;

**(2)** The expenses are reported to us within one year of the date the expenses were incurred; and

**(3)** The product that is the subject of the "product withdrawal" was produced after the Cut-Off Date designated in the Schedule.

**d.** The initiation of a "product withdrawal" will be deemed to have been made only at the earliest of the following times:

**(1)** When you first announced, in any manner, to the general public, your vendors or to your employees (other than those employees directly involved in making the determination) your decision to conduct or participate in a "product withdrawal". This applies regardless of whether the determination to conduct a "product withdrawal" is made by you or is requested by a third party; or


© ISO Properties, Inc., 2003

**(2)** When you first received, either orally or in writing, notification of an order from an authorized government entity to conduct a "product withdrawal.

**e.** "Product withdrawal expenses" incurred to withdraw "your products" which contain the same or substantially similar "defects" will be deemed to have arisen out of the same "product withdrawal".

**2. Exclusions**

This insurance does not apply to "product withdrawal expenses" arising out of:

**a. Breach Of Warranty And Failure To Conform To Intended Purpose**

Any "product withdrawal" initiated due to the failure of "your product" to accomplish their intended purpose, including any breach of warranty of fitness, whether written or implied. This exclusion does not apply if such failure has caused or is reasonably expected to cause "bodily injury" or physical damage to tangible property other than "your product".

**b. Infringement Of Copyright, Patent, Trade Secret, Trade Dress Or Trademark**

Any "product withdrawal" initiated due to copyright, patent, trade secret, trade dress or trademark infringements.

**c. Deterioration, Decomposition Or Chemical Transformation**

Any "product withdrawal" initiated due to transformation of a chemical nature, deterioration or decomposition of "your product". This exclusion does not apply if it is caused by:

**(1)** An error in manufacturing, design, or processing;

**(2)** Transportation of "your product"; or

**(3)** "Product tampering".

**d. Goodwill, Market Share, Revenue, Profit Or Redesign**

The costs of regaining goodwill, market share, revenue or "profit" or the costs of redesigning "your product".

**e. Expiration Of Shelf Life**

Any "product withdrawal" initiated due to expiration of the designated shelf life of "your product".

**f. Known Defect**

A "product withdrawal", initiated because of a "defect" in "your product" known to exist by the Named Insured or the Named Insured's "executive officers", prior to the date when this Coverage Part was first issued to you or prior to the time "your product" leaves your control or possession.

**g. Otherwise Excluded Products**

A recall of any specific products for which "bodily injury" or "property damage" is excluded under Coverage **A** – Bodily Injury And Property Damage Liability by endorsement.

**h. Governmental Ban**

A recall when "your product" or a component contained within "your product" has been:

**(1)** Banned from the market by an authorized government entity prior to the policy period; or

**(2)** Distributed or sold by you subsequent to any governmental ban.

**i. Defense Of Claim**

The defense of a claim or "suit" against you for liability arising out of a "product withdrawal".

**j. Third Party Damages, Fines And Penalties**

Any compensatory damages, fines, penalties, punitive or exemplary or other non-compensatory damages imposed upon the insured.

**k. Pollution-Related Expenses**

Any loss, cost or expense due to any:

**(1)** Request, demand, order, statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 © ISO Properties, Inc., 2003 

**B.** For the purposes of this endorsement, **Section III – Limits Of Insurance** is replaced by the following:

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** "Product withdrawals" initiated; or

**c.** Number of "your products" withdrawn.

**2.** The Aggregate Limit is the most we will reimburse you for the sum of all "product withdrawal expenses" incurred for all "product withdrawals" initiated during the policy period.

**3. Deductible And Participation Percentage Provisions**

**a. Deductible**

We will only pay for the amount of "product withdrawal expenses" which are in excess of the deductible amount, if any, shown in the Schedule of this endorsement. The deductible applies separately to each "product withdrawal". The limits of insurance will not be reduced by the amount of this deductible.

We may, or will if required by law, pay all or any part of any deductible amount, if applicable, to effect settlement of any claim or "suit". Upon notice of our payment of a deductible amount, you shall promptly reimburse us for the part of the deductible amount we paid.

**b. Participation Percentage**

If a Participation Percentage is indicated in the Schedule of this endorsement, the following provision applies:

You agree to participate in the payment of "product withdrawal expenses" which are in excess of the Deductible, to the extent of the Participation Percentage indicated in the Declarations. The Participation Percentage will apply separately to each "product withdrawal".

You also agree that the cost of your participation in the loss will be borne entirely by you when due and you will not obtain insurance to cover it.

The Limits of Insurance of Product Withdrawal Expense Coverage apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**C.** For the purposes of this endorsement, the **Duties In The Event Of Occurrence, Claim Or Suit Condition** under **Section IV – Conditions** is replaced by the following:

**2. Duties In The Event Of A "Defect" Or A "Product Withdrawal"**

**a.** You must see to it that we are notified as soon as practicable of any actual, suspected or threatened "defect" in "your product", or any governmental investigation, that may result in a "product withdrawal". To the extent possible, notice should include:

**(1)** How, when and where the "defect" was discovered;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature, location and circumstances of any injury or damage arising out of use or consumption of "your product".

**b.** If a "product withdrawal" is initiated, you must:

**(1)** Immediately record the specifics of the "product withdrawal" and the date it was initiated; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the "product withdrawal" as soon as practicable.

**c.** You must promptly take all reasonable steps to mitigate the expenses associated with a "product withdrawal". Any "profit" that you receive from mitigating the expenses will be deducted from the amount of reimbursement that you will receive for "product withdrawal expenses".

 © ISO Properties, Inc., 2003 

**d.** You and any other involved insured must:

**(1)** Immediately send us copies of pertinent correspondence received in connection with the "product withdrawal";

**(2)** Authorize us to obtain records and other information; and

**(3)** Cooperate with us in our investigation of the "product withdrawal".

**D.** For the purposes of this endorsement, the following condition is added to **Section IV – Conditions:**

**Concealment Or Fraud**

We will not provide coverage under Section **I** of this endorsement to you, or any other insured, who at any time:

**1.** Engaged in fraudulent conduct; or

**2.** Intentionally concealed or misrepresented a material fact concerning a "product withdrawal" or "product withdrawal expenses" incurred by you under Section **I** of this endorsement.

**E.** The following definitions are added to the **Definitions** Section:

**1.** "Defect" means a defect, deficiency or inadequacy that creates a dangerous condition.

**2.** "Product tampering" is an act of intentional alteration of "your product" which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".

When "product tampering" is known, suspected or threatened, a "product withdrawal" will be limited to those batches of "your product" which are known or suspected to have been tampered with.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**3.** "Product withdrawal" means the recall or withdrawal:

**a.** From the market; or

**b.** From use by any other person or organization;

of "your products", or products which contain "your products", because of known or suspected "defects" in "your product", or known or suspected "product tampering", which has caused or is reasonably expected to cause "bodily injury" or physical injury to tangible property other than "your product".

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**4.** "Product withdrawal expenses" means those reasonable and necessary extra expenses, listed below, paid and directly related to a "product withdrawal":

**a.** Costs of notification;

**b.** Costs of stationery, envelopes, production of announcements and postage or facsimiles;

**c.** Costs of overtime paid to your regular non-salaried employees and costs incurred by your employees, including costs of transportation and accommodations;

**d.** Costs of computer time;

**e.** Costs of hiring independent contractors and other temporary employees;

**f.** Costs of transportation, shipping or packaging;

**g.** Costs of warehouse or storage space; or

**h.** Costs of proper disposal of "your products", or products that contain "your products", that can not be reused, not exceeding your purchase price or your cost to produce the products.

5. **"Profit" means the positive gain from business operation after subtracting for all expenses**

 © ISO Properties, Inc., 2003 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Designation Of Premises (Part Leased To You):**<br>5034 Hampton Street<br>Vernon, CA 90058 |
| **Name Of Person(s) Or Organization(s) (Additional Insured):**<br>2525 Fruitland Associates, LLC<br>3801 S Santa Fe Ave #A<br>Vernon, CA 90058 |
| **Additional Premium: $** |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

**1.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**2.** Structural alterations, new construction or demolition operations performed by or on behalf of the person(s) or organizations(s) shown in the Schedule.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations

 © Insurance Services Office, Inc., 2012 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED PRODUCTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Designated Product(s):**
all products that do not contain alcohol content warning

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of any of "your products" shown in the Schedule.

 Copyright, Insurance Services Office, Inc., 1984 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Description And Location Of Premises Or Classification:** |
| --- |
| All Locations |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

**1.** Section **I** – Coverage **C** – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

**2.** The following is added to Section **I** – Supplementary Payments:

**h.** Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

 © ISO Properties, Inc., 2000 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

 © ISO Properties, Inc., 2006 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

 Copyright, Insurance Services Office, Inc., 1998 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

Professional services include:

**1.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

**2.** Supervisory, inspection, architectural or engineering activities.

 Copyright, Insurance Services Office, Inc., 1997 

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Name Of Person Or Organization:**<br>SYSCO Corporation, its affiliates, subsidiaries and divisions<br>20701 East Currier Rd<br>Walnut, CA 91789-2904 |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV – Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.


© Insurance Services Office, Inc., 2008

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

 © ISO Properties, Inc., 2003 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** This insurance does not apply to "bodily injury" or "property damage" arising out of, caused by, or attributable to, whether in whole or in part, the following:

1. The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or
2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;
2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;
3. A reinforced or unreinforced base coat;
4. A finish coat providing surface texture to which color may be added; and
5. Any flashing, caulking or sealant used with the system for any purpose.

 © ISO Properties, Inc., 2003 

"NOTICE:

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT,

**BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

**7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**

**8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU."**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CROSS SUITS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS COVERAGE PART**

**SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions, COVERAGE D PROFESSIONAL LIABILITY, 2. Exclusions** and **SECTION I – COVERAGES PRODUCTS/COMPLETED OPERATIONS BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** are amended and the following is added:

**CROSS SUITS EXCLUSION**

This Policy does not apply to a claim, demand or "suit" for damages initiated, alleged, or caused to be brought about by a Named Insured covered by this Policy against any other Named Insured. It is the intent of this exclusion to exclude from this insurance all claims, demands or "suits" as above described.

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________
(Authorized Representative)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTINUOUS OR PROGRESSIVE INJURY AND DAMAGE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS COVERAGE PART**
**OWNERS AND CONTRACTORS PROTECTIVE COVERAGE PART**

It is agreed under **Section I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement**, Paragraph **b (3)**, **c** and **d** are deleted in their entirety and the following exclusion is added to **Section I, 2. Exclusions** of this policy.

This insurance does not apply to:

1. Any damages arising out of or related to "bodily injury" or "property damage" whether such "bodily injury" or "property damage" is known or unknown,

   (a) which first occurred in whole or in part prior to the inception date of this policy (or the retroactive date of this policy, if any; whichever is earlier); or

   (b) which are, or are alleged to be, in the process of occurring as of the inception date of the policy (or the retroactive date of this policy, if any; whichever is earlier) even if the "bodily injury," or "property damage" continues during this policy period; or

   (c) which were caused, or are alleged to have been caused, by the same condition(s) or defective construction which first existed prior to the inception date of this policy.

2. Any damages arising out of or related to "bodily injury" or "property damage" whether known or unknown, which are in the process of adjustment, settlement, or "suit" as of the inception date of this policy (or the retroactive date of this policy, if any; whichever is earlier).

We shall have no duty to defend any insured against any loss, claim, "suit," or other proceeding alleging damages arising out of or related to "bodily injury" or "property damage" to which this endorsement applies.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective          Policy No.          Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY DEDUCTIBLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| | AMOUNT AND BASIS OF DEDUCTIBLE | |
|---|---|---|
| **COVERAGE A** | **PER CLAIM** | **PER OCCURRENCE** |
| **BODILY INJURY LIABILITY** | **$** | **$** |
| **OR** | | |
| **PROPERTY DAMAGE LIABILITY** | **$** | **$** |
| **OR** | | |
| **BODILY INJURY LIABILITY AND/OR PROPERTY DAMAGE LIABILITY COMBINED** | **$** | **$** 10,000 |
| | **PER INJURY** | |
| **COVERAGE B** PERSONAL AND ADVERTISING INJURY LIABILITY | **$** 10,000 | |
| **COVERAGE C** | **PER CLAIM** | **PER OCCURRENCE** |
| **MEDICAL PAYMENTS** | **$** | **$** |

**A.** Our obligation under the Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability or Medical Payments Coverages to pay damages and Supplementary Payments on your behalf applies only to the amount of damages and Supplementary Payments in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

**B.** Your policy may have a deductible amount on either a per claim, a per "occurrence," or a per injury basis. Your deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

**1.** **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

**a.** Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage";

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

**(1)** "Bodily injury";
**(2)** "Property damage"; or
**(3)** "Bodily injury" and "property damage" combined; or

**d.** Under Supplementary Payments – Coverages **A** and **B**, to all amounts we pay in the defense and investigation of any claim or "suit" to which this insurance applies;

**e.** Under Medical Payments Coverage **C**, to all damages sustained by any one person because of "bodily injury";

as the result of any one "occurrence."

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury," a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage," person includes an organization.

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a per "occurrence" basis, that deductible amount applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages because of "property damage";

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

      (1) "Bodily injury";

      (2) "Property damage"; or

      (3) "Bodily injury" and "property damage" combined; or

   d. Under Supplementary Payments – Coverages **A** and **B**, to all amounts we pay in the defense and investigation of any claim or "suit" to which this insurance applies.

   e. Under Medical Payments Coverage **C**, to all damages sustained by any one person because of "bodily injury";

   as the result of any one "occurrence," regardless of the number of persons or organizations who sustain damages because of that "occurrence."

3. **PER INJURY BASIS.** If the deductible amount indicated in the Schedule above is on a per injury basis, the deductible amount applies as follows:

   a. Under the Personal and Advertising Injury Liability Coverage to all damages because of "personal and advertising injury" sustained by any one person or organization as a result of any one injury.

   b. Under Supplementary Payments – Coverages **A** and **B**, to all amounts we pay in the defense and investigation of any claim or "suit" to which this insurance applies.

**C.** The terms of this insurance, including those with respect to:

   1. Our right and duty to defend the insured against any "suits" seeking those damages; and

   2. Your duties in the event of an "occurrence," claim, or "suit"

   apply irrespective of the application of the deductible amount.

**D.** We, at our sole election and option, may either:

   1. Pay any part of or all of the deductible amount to effect settlement of any claim or "suit" or payment of Supplementary Payments. Upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us; or

   2. Simultaneously upon receipt of notice of any claim or "suit," or at any time thereafter, request you pay or deposit with us all or any part of the deductible amount, to be held and applied by us as herein provided.

**E.** The deductible may not be satisfied by payments made by any additional insured, any other insurance, or any other insurer, unless such payments are made under a policy written specifically to cover the deductible obligations under this policy.

**F.** Notwithstanding any other provision of this policy or any endorsements thereto, including the Separation of Insureds Condition, all Named Insureds are jointly and severally liable to us for payment of the full deductible amounts applicable to any and all claims and "occurrences" to which this policy may apply.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HAZARDOUS MATERIALS EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS COVERAGE PART**
**OWNERS AND CONTRACTORS PROTECTIVE COVERAGE PART**

A. **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions**, and **SECTION I – COVERAGES, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions**, and **SECTION I – COVERAGES, PRODUCTS/COMPLETED OPERATIONS BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, and SECTION I – COVERAGES BODILY INJURY AND PROPERTY DAMAGE LIABILITY** are amended and the following Exclusion is added:

This insurance does not apply to:

**Hazardous Materials**

**(1)** "Bodily injury," "property damage" or "personal and advertising injury" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, ingestion, inhalation, dispersal, seepage, migration, release or escape of "hazardous materials" at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "hazardous materials"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "hazardous materials."

**(3)** Any obligations to share damages with or indemnify another party whom must pay damages because of injury or damage relating to "hazardous materials."

**(4)** Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with paragraphs **(1)**, **(2)**, or **(3)** above.

This exclusion applies whether or not such "hazardous material(s)" has any function in your business, operations, premises, site or location.

B. **SECTION V – DEFINITIONS** is amended and the following added:

**"Hazardous materials"** means "pollutants," and materials that are radioactive, corrosive, oxidizers, asphyxiates, biohazardous, toxic, pathogen or allergen substances and organisms, lead, asbestos, silica and materials containing them.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective　　Policy No.　　Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**
**OWNERS AND CONTRACTORS PROTECTIVE COVERAGE PART**
**LIQUOR LIABILITY COVERAGE FORM**

This insurance does not apply to any claim for punitive or exemplary damages, fines or penalties imposed by law, restitution or any damages which are a multiple of, or in addition to, compensatory damages including related interest or costs whether or not such damages, related interest or costs are characterized as punitive or exemplary damages (hereinafter referred to as punitive or exemplary damages). If a "suit" shall have been brought against the insured for a claim falling within the coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then the company will afford a defense to such action; however, the company shall not have an obligation to pay for any costs, interest, or damages attributable to punitive or exemplary damages.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective　　Policy No.　　Endorsement No.

Named Insured

Countersigned by ______________________________

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AIRCRAFT, AIRCRAFT PRODUCTS AND AIRCRAFT GROUNDING EXCLUSION

This endorsement modifies insurance provided under the following;

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

A. **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions,** and **SECTION I – COVERAGES, PRODUCTS/COMPLETED OPERATIONS BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions,** are amended and the following Exclusion is added:

**Aircraft, Aircraft Products and Aircraft Grounding**

This insurance does not apply to "bodily injury" or "property damage" arising out of or resulting from:

**a.** ownership, maintenance, use, or operation of any aircraft;
**b.** any "aircraft product" including the design, manufacture, sale, handling, distribution of, or reliance upon any representation or warranty with respect thereto, or to any liability of the "grounding" of any aircraft; or
**c.** "your work" on aircraft (including missile or spacecraft, and any ground support or control equipment);
**d.** "loading or unloading" or entrustment to others of any aircraft;
**e.** liability assumed by you under any contract or agreement if such liability arises out of "aircraft products" designed, manufactured, sold, handled or distributed by you or by others trading under your name.

B. **SECTION V – DEFINITIONS** is amended and the following added:

**"Aircraft product"** means:

**a.** Aircraft (including missile or spacecraft, unmanned aerial or drone vehicles and any ground support or control equipment used therewith);
**b.** Any article furnished by you or on your behalf and installed in an aircraft or used in connection with an aircraft or for spare parts for an aircraft including ground handling tools and equipment;
**c.** Any of "your products" used at an airport for the purpose of guidance, navigation or direction of aircraft, training aids, instructions, manuals, blueprints, engineering or other data or advice and services and labor relating to such aircraft, articles or products that you or any other person or organization on your behalf:
  **(1)** sold, handled or distributed; or
  **(2)** manufactured, assembled or processed:
    **(a)** according to specifications, plans, suggestions, orders, or drawings provided by you or on your behalf; or
    **(b)** with tools, machinery or equipment furnished to such persons or drawings provided by you or on your behalf.

**"Grounding"** means:

**a.** the withdrawal of one or more aircraft from flight operations; or
**b.** the imposition of speed, passenger or load restrictions on such aircraft

by reason of the existence of or alleged or suspected existence of any defect, fault or condition in such aircraft or any part thereof whether such aircraft so withdrawn are owned or operated by the same or different persons, organizations or corporations.

**"Loading or unloading"** means:

**a.** The handling of property, while it is being moved from the place where it is accepted for transportation;
**b.** While it is loaded, transported, and unloaded; and
**c.** Until it is moved to the place where it is finally delivered.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIOR INJURY OR DAMAGE
# CLAIMS MADE COVERAGE ENDORSEMENT

**THIS ENDORSEMENT PROVIDES CLAIMS-MADE COVERAGE**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM**

**SCHEDULE**

**Retroactive Effective Date-Retroactive Expiration Date**
08/26/2006-08/26/2011

In consideration of premium charged, coverage for prior losses is provided as follows:

**A.** This policy applies to "property damage" and "bodily injury" caused by **AN "OCCURRENCE" TO WHICH THIS INSURANCE APPLIES**, but:

**1.** The "property damage" or "bodily injury" must have occurred prior to the effective date of this policy and between the dates referenced in the Schedule above;

**2.** A claim for damages because of the "property damage" or "bodily injury" referred to in A.1. must have been first made against the insured during the policy period, and first reported to us in writing during the policy period or within thirty (30) days after expiration of the policy period;

**3.** Prior to the policy period, no insured or "employee" of any insured knew that the "property damage" or "bodily injury" had occurred, in whole or in part. If any insured or "employee" of any insured knew, prior to the policy period, that the "property damage" or "bodily injury" had occurred, in whole or in part, then any continuation, change or resumption of the "property damage" or "bodily injury" during the policy period will be deemed to have been known prior to the policy period; and

**4.** "Property damage" or "bodily injury" will be deemed to have been known to have occurred at the earliest time when any insured:

**a.** Reports all, or any part, of the "property damage" or "bodily injury" to us or any other insurer; or

**b.** Receives a written or verbal demand for damages because of the "bodily injury" or "property damage"; or

**c.** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**B.** LIMITS

**1.** The amount we will pay for damages is limited as described in **SECTION III – LIMITS OF INSURANCE**; however:

**a.** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements; and

**b.** No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS.**

**2.** The prior loss coverage provided by this endorsement does not increase the Limits of Insurance shown in the Declarations of the policy.

**a.** The prior loss coverage provided by this endorsement is subject to, and not in addition to, the General Aggregate Limit or the Products Completed Operations Aggregate Limit as shown in the Declarations of the policy.

**b.** Payments for damages because of "property damage" or "bodily injury" covered under this endorsement, and for expenses incurred in the defense and adjustment of claims and "suits" alleging "property damage" or "bodily injury" covered under this endorsement, are part of and erode the policy General Aggregate Limit or the Products-Completed Operations Aggregate Limit of Insurance as shown in the Declarations.

**C.** This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis.

This endorsement does not extend the policy period or change the scope of coverage provided. It applies only to "property damage" and "bodily injury" that first occurred before the inception date of this policy and within the Retroactive Effective Date and Retroactive Expiration Date shown in the Schedule.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SUBSIDENCE EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS COVERAGE PART**
**OWNERS AND CONTRACTORS PROTECTIVE COVERAGE PART**

**SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** and **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions** and **SECTION I – COVERAGES PRODUCTS/COMPLETED OPERATIONS BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** and **SECTION I – COVERAGES BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** are amended and the following is added:

This insurance does not apply to:

"Bodily injury" or "property damage" directly or indirectly arising out of caused by, resulting from, contributed to, aggravated by or related to the subsidence, settling, settlement, expansion, sinking, slipping, falling away, tilting, caving in, shifting eroding, rising, heaving, landslide, flood or mud flow, earthquake, volcanic eruption or other tectonic processes or any other movement, of land or earth, however caused, and whether by natural, manmade, accidental or artificial means. This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the “bodily injury” or “property damage.”

We shall have no duty or obligation on our part under this insurance to defend, respond to, investigate or indemnify any insured against any loss, claim, "suit," or other proceeding alleging damages arising out of or related to "bodily injury" or "property damage" to which this endorsement applies.

This exclusion also applies to any obligation to, share damages with, repay or indemnify someone else who must pay damages because of such “bodily injury” or “property damage.”

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MINIMUM EARNED PREMIUM ENDORSEMENT

The following additional policy Conditions supersede any other policy conditions and the Named Insured hereby agrees that the total policy premium and minimum earned premium(s) due for this policy shall be calculated in accordance with the following:

**Total Policy Premium**

This policy is subject to a Total Policy Premium which means the premium that is calculated as follows:

1. The deposit premium as shown in the policy Declarations, plus
2. Any premium adjustment by endorsement, plus
3. Any additional premium developed by audit.

The premium entered on the Declarations page of this policy as DEPOSIT PREMIUM is a provisional premium only and is subject to adjustment in accordance with our rules, rates and the Premium Audit provisions of this policy.

**A. Minimum Earned Premium by Date Certain**

If the box below is checked and a date filled in where applicable the minimum earned premium for this policy will be 100% earned by the specific date referenced in this endorsement and there will be no return of premium if you cancel this policy.

☐ After ( ) the premium is fully earned.

**B. Audits and Minimum Earned Premium**

With regard to audits the DEPOSIT PREMIUM as stated in the policy Declarations cannot be reduced due to an audit. Premium adjustments affected as a result of premium audits may be done while the policy is in effect or after the policy is no longer in effect. The due date for audit premiums is the date shown as the due date on the bill.

**C. Cancellation and Minimum Earned Premium**

1. If you cancel this policy, the return premium will be the lesser of:
   a. 90% of the pro rata unearned premium or
   b. 75 % of the Deposit Premium.

2. If the Named Insured fails to remit premium payment when due, such failure shall be considered a request by the Named Insured to cancel this policy and the return premium will be determined in accordance with C. 1.

3. If we cancel the policy for any reason, other than for non-payment of premium, the "minimum earned premium" shall not apply. We will return to you the pro rata amount of the unearned premium.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF TERRORISM

Notwithstanding anything to the contrary contained in the policy or any endorsement attached thereto, it is agreed that this insurance does not apply to "**any injury or damage**" caused directly by or as a consequence of a "**certified act of terrorism**" or "**other act of terrorism**," including any action not otherwise excluded under the War and Military Action exclusion that is taken by a government or sovereign power (de jure or de facto) in controlling, preventing, suppressing, retaliating against or in any way responding to a "**certified act of terrorism**" **or** "**other act of terrorism**." Such injury or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, even if the act of a "**certified act of terrorism**" or "**other act of terrorism**," that causes or results in the loss or damage itself is itself a cause of loss that is otherwise insured against under this policy.

If, by reason of this exclusion, we allege that any loss or damage under this policy is not covered, the burden of proving that such loss or damage is covered shall be upon you.

The following definitions are added:

**1.** For the purposes of this endorsement, "**any injury or damage**" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury," "property damage," "personal and advertising injury," "injury," "environmental damage" or "errors or omissions" as may be defined in any applicable Coverage Part.

**2.** "**Certified act of terrorism**" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "**Other act of terrorism**" means any violent act that is dangerous or destructive to human life, property or infrastructure, whether actual or threatened, and whether committed by one or more persons acting alone or in connection with any group or organization. The act must not be certified as a "**certified act of terrorism**" pursuant to the federal Terrorism Risk Insurance Act and the act must contain one or more of the following criteria:

**a.** The act is intended to influence, coerce or protest against the actions, behavior or policies of any government or sovereign power (de jure or de facto) or any segment of the government or sovereign; or

**b.** To further any political, ideological, economic, religious or social aim, objective or cause; or

**c.** To disrupt any segment of the global economy or the economy of any country or political state.

It is the intent of this endorsement to exclude from this insurance all claims, demands or "suits" arising from the insurable coverage excluded under this endorsement. There shall, therefore, be no duty or obligation on our part under this insurance to defend, respond to, investigate or indemnify anyone, including but not limited to you, your agents, servants or employees, or any third parties for any such claim, demand or suit.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – VENDORS AUTOMATIC STATUS WHEN REQUIRED IN AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

**A. SECTION II – WHO IS AN INSURED** Is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy, but only with respect to liability for "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and included in the "products-completed operations hazard." Coverage is subject to the following additional exclusions:

**1.** The insurance afforded the vendor does not apply to:

**a.** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**b.** Any express warranty unauthorized by you;

**c.** Any physical or chemical change in the product made intentionally by the vendor;

**d.** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**e.** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**f.** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**g.** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**i.** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(1)** The exceptions contained in sub-paragraphs **d.** or **f.**; or

**(2)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**2.** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED PHARMACEUTICAL AND NUTRITIONAL SUPPLEMENT PRODUCTS

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

The following exclusion is added to **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, Item **2. Exclusions**, **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**, Item **2. Exclusions**, and **SECTION I – COVERAGES – PRODUCTS/COMPLETED OPERATIONS**, Item **2. Exclusions**:

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" due to the following Designated Products:

1. All vaccines, birth control pills or birth control devices.
2. All ingestible, injectible, respirable, inhalable, topical or other products that are, or contain, or are derivatives of, any of the following:
   - 2(3H) – Furanone di-hydro;
   - Accutane; Andro; Androstenedione; Androstenediol;
   - Aristolochia spp., aristolochia, aristolochic acids, aristolochia fangchi, asarum app., bragantia spp., clematis spp., akebia spp., cocculus spp.;
   - Diploclisia spp., menispernum spp., sinomenium spp., mu ton, fang ji, guang fang ji, fang chi, kanmokutso, mokutso, and any adulterated botanicals, botanical derivatives or other products that contain aristolochic acid, aristolochic acid derivatives or aristolochic acid extracts;
   - Asarum Sieboldi Herba Cum Radix (Xi Xin);
   - BD (1, 4 butanediol); Bitter Orange (Synephrine);
   - Chapparral, Clozapine; Comfrey products (pyrrolizidine alkaloids);
   - Cox – 2 inhibitors including Vioxx, Celebrex, and Bextra or other rofecoxib, celecoxib, or Valecoxib products
   - Creatine;
   - Dexfenfluramine; DHEA (dehydroepiandosterone);
   - Ephedrine, ephedra, ephedra sinica, ephedra e. equisetina, ephedra alkaloid, pdeuoephedrine, or any other ephedra derivatives or extracts;
   - Diiodothyronine: Fenfluramine;
   - GBL (gamma butyrolactone); Germander; GHB (gamma hydroxybutyric acid); Green Tea;
   - Hormone Replacement Therapy products of any kind;
   - Lobeolla; L-Tryptophan; Latex in any form;
   - Jin Bu Haun; Kava; Kava-Kava, or Piper methysticum;
   - Lobelia;
   - Magnolia, or any adulterated botanicals, botanical derivatives or any other products that contain Magnolia, or any Magnolia derivatives or extracts;
   - Ma Haung; Naproxen; Nefazadone; OxyContin; M-Oxy, Oxyir, Percolone, Roxidone or Oxycodone;
   - PC SPES or SPES, Pennyroyal Oil; Phen fen; Phentemine; Phenypropanolamine; Pondimin; Pregnenolone; Redux; Remicade;
   - Scullcap; Sodium usniate;
   - Stephania, stephania spp., or any adulterated botanicals, botanical derivatives or any other products that contain Stephania, or any Stephania derivatives or extracts;
   - Steroids or anabolic hormones; Tetramethylene glycol; Yohimbe, Zinc Nasal Sprays.
3. Your products which are subject to approval by the United States Food and Drug Administration (FDA) or which would be subject to such approval if sold or distributed in the United States; and
   a. which have not been approved prior to sale or distribution;

b. for which the FDA issued notice in writing that approval applications are required, which has not been challenged by the insured; or

c. for which the FDA has issued notice in writing that the approval applications are required and that there is a reasonably probability that the use of the product will cause serious adverse health consequences or death.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

(The following information is required only when this endorsement is issued subsequent to preparation of the Policy.)

Endorsement effective Policy No. Endorsement No.

Named Insured

Countersigned by ______________________________

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".


© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007 

# CLAIM NOTIFICATION

Send all claim notifications and information to:

First Mercury Insurance Company

P.O. Box 5096
Southfield, Michigan 48086

Or

26600 Telegraph Rd.
Southfield, MI 48033

Or Fax to:

First Mercury Insurance Company

Attn: Claim Department
Fax Number: (248) 357-5036

Or Email to
Claimsfax@firstmercury.com

This endorsement forms a part of the Policy to which attached, effective on the inception date of the Policy unless otherwise stated herein.

COVERXSPECIALTY
A member of the Crum & Forster Enterprise
INSURANCE SERVICES

26600 Telegraph Rd.
Southfield, MI 48033

P.O. Box 5069
Southfield, MI 48086

09/15/2014

**Re:** Millennium Products Inc (DBA) GTs Kombucha
CA-CGL-0000016581-03

# IMPORTANT NOTICE TO POLICYHOLDERS

**PLEASE REVIEW THIS RENEWAL DECLARATION CAREFULLY. WHILE YOUR POLICY NUMBER AND INSURANCE CARRIER HAVE NOT CHANGED FROM YOUR EXPIRING POLICY, THE ATTACHED DECLARATION PAGE UPDATES COVERAGES, TERMS AND CONDITIONS FOR YOUR RENEWAL TERM AND MAY DIFFER FROM THOSE EXPIRING AS WELL AS THOSE REQUESTED IN YOUR RENEWAL APPLICATION. NEW OR CHANGED POLICY FORMS WILL BE THE ONLY FORMS ATTACHED TO THIS RENEWAL DECLARATION.**

**PLEASE REVIEW THIS DECLARATION AND/OR CONSULT WITH YOUR AGENT/BROKER AND ADVISE US IMMEDIATELY IN WRITING OR VIA FAX SHOULD YOU HAVE ANY QUESTIONS, CONCERNS OR CHANGES TO YOUR POLICY.**

**Telephone: 1 (800) 762-6837 - Fax: 1 (248) 358-2459**

# EXHIBIT B

Clayeo C. Arnold, California SBN 65070
Email: carnold@justice4you.com
Joshua H. Watson, California SBN 238058
Email: jwatson@justice4you.com
**CLAYEO C. ARNOLD, A PROFESSIONAL LAW CORPORATION**
865 Howe Avenue
Sacramento, California 95825
916-777-7777 Telephone
916-924-1829 Facsimile

John Yanchunis, Florida Bar No. 324681
Email: jyanchunis@forthepeople.com
MORGAN & MORGAN COMPLEX LITIGATION GROUP
201 N Franklin Street, Floor 7
Tampa, FL 33602-5157
Telephone: (813)275-5272
Facsimile: (813)275-9295
*Pro Hac Vice Pending/Anticipated*

Attorneys for Plaintiffs,
Nina Pedro and Rosaline Lewis,
and those similarly situated

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

NINA PEDRO and ROSALINE LEWIS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MILLENNIUM PRODUCTS, INC., a California Corporation, Doing Business As GT KOMBUCHA, GT SYNERGY; GEORGE THOMAS "GT" DAVE, an individual, WHOLE FOODS MARKET CALIFORNIA, INC., and DOES 1-50, inclusive,

Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs ROSALINE LEWIS, and NINA PEDRO, by and through their undersigned counsel, on behalf of themselves and all other persons similarly situated, allege:

**INTRODUCTION AND SUMMARY OF THE ACTION**

1. Plaintiffs ROSALINE LEWIS and NINA PEDRO ("Plaintiffs") bring this action both in their individual capacities and as a proposed class action against defendants MILLENNIUM PRODUCTS, INC., a California Corporation, Doing Business As GT KOMBUCHA and GT SYNERGY (hereinafter referred to as "MILLENNIUM") and GEORGE THOMAS "GT" DAVE, an individual, (hereinafter referred to as "GT DAVE") (hereinafter collectively referred to as "Defendants"), each on behalf of herself and on behalf of all other similarly situated persons who have been damaged, per the class definition, by the Defendants' products (hereinafter collectively referred to as the "Class" or "Class Members").

2. As discussed in more detail *infra*, this case concerns Defendants' manufacturing, marketing, and distribution of various types of kombucha beverages whose secondary fermentation process, which occurs post-distribution in the bottle, cannot safely be controlled proximately causing kombucha beverages being sold to the general public that, among other things:

a) explode once the carbon dioxide levels in the bottle exceeds the pressure tolerance of the bottle and/or cap causing damage and/or loss of product;

b) leak from the cap once the carbon dioxide levels in the bottle exceeds the pressure tolerance of the cap causing damage and/or loss of product;

c) are under so much pressure that when the bottle is opened a majority of the product uncontrollably sprays out causing damage and/or loss of product;

d) have the caps on so tight that the bottle cannot be safely opened; and/or

e) contain alcohol in excess of 0.05% and are therefore adulterated and/or not properly labeled pursuant to State and Federal law.

(hereinafter collectively referred to as the "DEFECTS").

3. Plaintiffs are informed, believe, and based thereon allege that Defendants have actual knowledge about each of these DEFECTS and have failed to, among other things, disclose and adequately and reasonably warn the consumers about the DEFECTS and, therefore, the potential

and actual dangers posed by the DEFECTS are widespread, unreasonable, and unsafe to purchasers of Defendants' kombucha beverages.

**PARTIES**

4. Plaintiff NINA PEDRO (hereinafter referred to as "Plaintiff PEDRO") is and was at all relevant times a resident of the city of San Francisco, San Francisco County, California.

5. On multiple occasions within the past three years, including within the past year, Plaintiff PEDRO has purchased or otherwise obtained for consumption defendants' kombucha from Whole Foods, located in San Francisco, California. On multiple such occasions, Plaintiff PEDRO has found that her bottle of kombucha has broken its seal, leaked out of the bottle, spoiled, and by virtue of leaking spilled on and caused damage to her personal property, including but not limited to purses and handbags, as well as their contents.

6. On information and belief, this occurred because of the ongoing fermentation and/or related biological processes within the defendants' bottles of kombucha. The manner in which defendants manufacture, distribute, and sell kombucha results in the product being provided to consumers in a state where it has undergone and continues to undergo unmonitored biological activity via bacteria, yeast, and similar microorganisms in the product which cause byproducts of fermentation including but not limited to the production of gasses. Such byproducts, coupled with the chemical composition of the beverage, wear down protective seals on the product, causing the seals to fail, the product to leak, and resulting spoilage.

7. When the defendants' product so spoils, it causes loss of the benefit of the bargain for consumers such as Plaintiff PEDRO, and also related property damages. On information and belief, defendants are well aware of this spoilage and leaking problem from, *inter alia*, long standing customer complaints, widespread problems with product leakage during pre-sale storage and transportation, consumer-postings to defendants' websites/blogs/social media providing notice and commentary about such problems, and knowledge of the general properties of defendants' own product and of their competitor's products, many of which are sold in more secure and appropriate packaging.

8. Plaintiff ROSALINE LEWIS (hereinafter referred to as "Plaintiff LEWIS") is domiciled in Washington State, and provides diversity for the purposes of jurisdiction in this matter.

9. On or about sometime in December 2014, Plaintiff LEWIS purchased a bottle of defendants' kombucha from Whole Foods, located in San Francisco, California.

10. Plaintiff LEWIS purchased Defendants' kombucha from the non-alcoholic beverage section of Whole Foods and was not required to show identification upon purchase.

11. Plaintiff LEWIS consumed some of Defendants' kombucha and immediately became sick and experienced, among other things, trouble breathing, and increased heart rate.

12. The bottle of Defendants' kombucha that Plaintiff LEWIS consumed stated as follows regarding the alcohol content:

"Product contains a trace amount of alcohol."

13. Plaintiff LEWIS is informed, believes, and based thereon alleges that the kombucha beverage that Plaintiff LEWIS consumed contained alcohol in excess of .05%, the legally allowed limit of alcohol for a non-alcoholic beverage.

14. Plaintiff LEWIS is informed, believes, and based thereon alleges that had Defendants' properly labeled the alcohol content on their kombucha beverages Plaintiff LEWIS would not have purchased and consumed the product and, therefore, would not have gotten sick.

15. Plaintiffs are informed, believe, and based thereon allege that Defendants have actual knowledge about each of these DEFECTS and have failed to, among other things, disclose and adequately and reasonably warn the consumers about the DEFECTS and, therefore, the potential and actual dangers posed by the DEFECTS are widespread, unreasonable, and unsafe to purchasers of Defendants' kombucha beverages.

16. Plaintiffs are informed, believe, and based thereon allege that MILLENNIUM PRODUCTS INC. is a corporation organized under the laws of the State of California, having its principal place of business in Beverly Hills, California. Plaintiffs are informed, believe, and based thereon allege that Defendant MILLENNIUM does business throughout the United States and, in particular, does business in the State of California and in this County. Plaintiffs are informed, believe, and based thereon allege that Defendant MILLENNIUM manufactures, markets, and distributes multiple types of kombucha beverages that contain DEFECTS.

17. Plaintiffs are informed, believe, and based thereon allege that that Defendant GT DAVE is an adult male residing in Beverly Hills, California. Plaintiffs are informed, believe, and based thereon allege that defendant GT DAVE is the chief executor officer and shareholder of defendant MILLENNIUM.

18. Plaintiffs are informed, believe, and based thereon allege that Defendant WHOLE FOODS MARKET CALIFORNIA, INC. ("WHOLE FOODS") is a California Corporation engaged in the retail sale of products, including the subject kombucha, to the general public in California and throughout the country.

19. At all times herein mentioned, each of the Defendants were the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, were acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

20. At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership, and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership, and common enterprise.

21. At all times herein mentioned, the acts and omissions of Defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

22. At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

23. The complete and true names, involvement and/or capacities, whether individual, corporate, professional, or otherwise, of the Defendants named herein as DOES 1 through 50, are not presently fully known and/or are unknown to Plaintiffs who, therefore, sues said defendants under such fictitious names. Plaintiff requests leave of this Court to amend this Complaint to set forth the true names, involvement, and/or capacities, whether individual, corporate, professional, or otherwise,

when the same have been ascertained or adequate discovery is produced, provided and/or obtained. Plaintiff is further informed, believes, and based thereon alleges that DOES 1-50 have aided, abetted, directly or actively participated in, and/or ratified the conduct complained of herein. Plaintiff further alleges that all of the defendants designated as DOES 1-50 are responsible for and are a direct and legal cause in some manner of the events, happenings, tortuous conduct, malfeasance and damages complained of herein or referred to, which caused the injuries and damages to Plaintiff as set forth in this Complaint.

24. Plaintiff is informed, believes, and based thereon alleges that at all relevant times herein Defendants and/or DOES 1-50 were and are attorneys, officers, directors, agents, representatives, servants, joint venturers, aiders and abettors, co-conspirators, representatives, and/or employees of the other Defendants, and each of them. Plaintiff is further informed, believes, and based thereon alleges that at all times relevant herein, the named Defendants and each of them, were acting within the scope and course of said agencies, services, ventures, conspiracies, and/or employment with the other defendants, and/or with their ratification, knowledge, and/or consent.

25. Plaintiffs are informed, believe, and based thereon allege that Defendants' manufacture, market, promote, distribute, and sell kombucha beverages containing DEFECTS throughout the United States, including to hundreds of thousands of consumers in California.

## JURISDICTION AND VENUE

26. The Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. §1332(d), because one of the Plaintiffs and the other Class members are of diverse citizenship from Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), excluding interest and costs.

27. Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff LEWIS' claim occurred, in this District.

## COMMON FACTUAL ALLEGATIONS

28. Plaintiffs are informed, believe, and based thereon allege that Defendant MILLENNIUM was founded by defendant GT DAVE in 1995 and Defendants are currently the leading manufacturers and distributors of multiple types of kombucha beverages that contain DEFECTS.

29. Plaintiffs are informed, believe, and based thereon allege that kombucha is generally an effervescent fermented drink of sweetened black tea that is manufactured, marketed, and sold by the Defendants to the general public as a functional food with several unsubstantiated health benefits.

30. Plaintiffs are informed, believe, and based thereon allege that the kombucha that Defendants' manufacture, market, and distribute to the general public is a mixed culture of several species of live bacteria and yeast that resembles a mushroom in appearance.

31. Plaintiffs are informed, believe, and based thereon allege that the kombucha that Defendants' manufacture, market, and distribute to the general public is made by adding a starter sample of kombucha culture (symbiotic colony of bacteria and yeast, or "SCOBY") from an existing culture to sugar and black or green tea and allowing the mixture to ferment.

32. Plaintiffs are informed, believe, and based thereon allege that in or about June 2010, Defendants, in response to investigations by multiple government agencies over the alcohol content of their kombucha beverages as well as a class action lawsuit alleging the same, were forced to take their kombucha beverages off of the market.

33. Plaintiffs are informed, believe, and based thereon allege that in or about December 2010, Defendants re-launched two separate lines of kombucha back onto the market.

34. Plaintiffs are informed, believe, and based thereon allege that the first line will be hereinafter referred to as the "Enlightened" brand that is manufactured, marketed, and distributed by Defendants as containing less than 0.5% alcohol ("ENLIGHTENED").

35. Plaintiffs are informed, believe, and based thereon allege that the second line will be hereinafter referred to as the "Classic" brand that is manufactured, marketed, and distributed by Defendants as containing in excess of 0.5% alcohol and can only be purchased by persons over twenty-one years old ("CLASSIC").

36. At all times relevant to this complaint, Defendants published the following pertinent statements on their website at http://www.synergydrinks.com/ about their kombucha beverages:

> "Our Enlightened™ line of GT's Kombucha is a new interpretation of an ancient elixir. It has a lighter and smoother personality than our original formula with the same high nutritional value that you expect from us. With a unique blend of proprietary probiotics and powerful antioxidants, each bottle is designed to nourish your body from the inside out."

http://synergydrinks.com/index.php/products#enlightened-kombucha

> "Our Classic line of GT's Kombucha has the bold and identifiable effect that we first introduced in 1995 that made the name GT's Kombucha synonymous with quality. We have chosen to modify our labeling instead of compromise our formula. GT's Classic may contain more than 0.5% alcohol therefore you must be 21 or over to purchase."

http://synergydrinks.com/index.php/products#classic-kombucha

37. Plaintiffs are informed, believe, and based thereon allege that both Defendants' ENLIGHTENED and CLASSIC kombucha contain alcohol in excess of the amount stated on the bottle in violation of both State and Federal law.

38. Plaintiffs are informed, believe, and based thereon allege that as part of their uniform custom and practice, Defendants advertise and market both the CLASSIC and ENLIGHTENED kombucha to the general public in California and throughout the United States of America.

39. Plaintiffs are informed, believe, and based thereon allege that a byproduct of the Defendants' kombucha's fermentation process is carbon dioxide (CO2).

40. Plaintiffs are informed, believe, and based thereon allege that after the Defendants' bottle the kombucha it continues to ferment, especially when the kombucha is stored at or above room temperature ("SECONDARY FERMENTATION") which process proximately causes the DEFECTS alleged herein.

41. Plaintiffs are informed, believe, and based thereon allege that the DEFECTS caused by the SECONDARY FERMENTATION process are magnified when the kombucha contains chia seeds because during the SECONDARY FERMENTATION process the chia  seeds expand thereby significantly increasing both the volume and pressure in the bottles the contain the kombucha.



42. Plaintiffs are informed, believe, and based thereon allege that Defendants cannot control the SECONDARY FERMENTATION process that occurs in the bottles of Defendants' kombucha and that Defendants have actual knowledge of the same.

43. Plaintiffs are informed, believe, and based thereon allege that it is Defendants' inability to control the SECONDARY FERMENTATION process of their Kombucha beverages that proximately causes the DEFECTS which pose significant potential and actual dangers to consumers.

44. Plaintiffs are informed, believe, and based thereon allege that the warning labels on Defendants' kombucha beverages fail to adequately and reasonably warn the consumers about the SECONDARY FERMENTATION process that occurs in the bottles as well as the DEFECTS that are proximately caused by the Defendants' inability to control and manage the same.

45. Plaintiffs are further informed, believe, and based thereon allege that the warning labels on Defendants' kombucha beverages fails to adequately and reasonably warn the consumers about the specific alcohol content contained in the beverages.

46. Plaintiffs are informed, believe and based thereon allege that the SECONDARY FERMENTATION results in pressures and/or chemical properties that make the subject kombucha inappropriate for packaging in the bottles utilized by defendants, but that defendants nonetheless continue to use such inappropriate packaging with insufficient seals, resulting in product spoilage, loss, and related consumer economic damages including loss of the benefit of the sale of the beverage and property damage related to the leaking of the beverage.

47. As set forth in detail below, from 2012 to the present there have been numerous consumer complaints to Defendants relating to the DEFECTS, and, as such, Plaintiffs are informed, believe, and based thereon allege that consumers are at real risk injury and damage due the DEFECTS contained in Defendants' kombucha and Defendants have actual knowledge of the same and have failed to take action to both reasonably and adequately warn and protect the consumers.

48. On November 26, 2012, the following was anonymously posted on Yahoo Answers:

> "So I caved and bought one of those Synergy drinks (grape flavored) with the weird seed things suspended in it. I was about to open it at the computer and it sounded like it was going to fizz all over the place. Because of that, I didn't open it right away. I left it there for about an hour, tried again, and the same thing happened.

I took it to the kitchen sink expecting it to make a mess, and let me tell you, I was most definitely right. Took the cap off a little more than before and the drink shot across the kitchen hitting the far wall.

How can they sell a drink that makes a huge mess when you open it? It's not like I shook it or anything, not that it should make a difference seeing as it isnt carbonated..

What caused this explosion? Is this normal?

**Update:** Just opened it the rest of the way...the cap blew off. It seemed like the glass bottle was under an extreme amount of pressure and i'm surprised it didn't break the glass...

It's now all over the closest two walls, all the previously clean pots/pans/dishes/ my face, and my sweatshirt.

What the f.

**Update 2:** Just found a seed on the washing machine...That isnt even in line of site of the sink...

**Update 3:** Jeffrey- The drink is not carbinated as far as i can tell from the label. The only ingredients are organic raw kombucha, raw chia seeds, and grape juice along with some probiotics. It is not pasteurized. The company says it kills most of the health benefits so they don't do that. The label does say the product might contain alcohol so I'm guessing it fermented. It isn't expired either."

https://answers.yahoo.com/question/index?qid=20121126034347AA9ZMIb

49. In response to posting set forth in Paragraph 48 *supra*, the following was posted by Kaleb on Yahoo Answers:

"mine always explode all over the place when i open them its normal"

https://answers.yahoo.com/question/index?qid=20121126034347AA9ZMIb

50. In response to the posting in Paragraph 48 *supra*, the following was posted by Connor:

"I'm thinking that you should check the label again to make sure it's not carbonated. They put so much effort into making these expensive drinks look good that the instruction sometimes get lost in the graphic design. If it's definitely not carbonized then it may be out of date (check the label) or had a bad seal or something went wrong during processing(like not properly pasteurizing) and it fermented (hay free alcohol).UPDATE Found it. This started to bug me so I started looking for similar stories, and lots of them.

> ***But After I went to a how to make Kombucha fact site I found out that in the process there is the opportunity for secondary fermentation in the bottle that can create a large amount of carbonation. So if the company does not carbonize the product it must occur in the bottle during the shipping process. the site said this occurs best at room temp and to refrigerate after the fermentation is over***." [emphasis added]

https://answers.yahoo.com/question/index?qid=20121126034347AA9ZMIb

51. On June 26, 2012, the following was posted on the website Daily Downward Dog:

> "Confessions of a Kombucha Virgin
>
> I attended a lunch with a bunch of my fellow yoga teachers a while back, and the subject of the conversation moved to kombucha. I didn't want to admit that I had no idea what it was, so I just listened intently as they went on about this wonder elixir. I remember hearing that it was all natural, contained magic mushrooms, was fizzy and to be opened with caution, could clean you out, and filled you up with renewed energy.
>
> I learned that kombucha can boost the immune system, reverse the aging process, and is a cure-all for a wide range of conditions including baldness, insomnia, intestinal disorders, arthritis, and cancer…but they had me with the mention of the magic mushrooms. If I could drink something healthy that gave me a little natural buzz and helped me stay young, I wanted to give it a try. I made a mental note to pick myself up some kombucha the next time I went to a health food store.
>
> A couple of months passed, and I hadn't yet tried kombucha. Then one day there were some extra bottles graciously left at Yoga Bliss Akron by my fellow yoga teacher, Juli Hicks (Yoga Bliss now carries GT's Kombucha, so you can grab a cold one after a yoga class). I was hot after teaching and in a hurry, so I grabbed a bottle and ran to my car shaking the bottle up to move around all the sediment that settles on the bottom of each bottle, which I have to admit kind of creeps me out.
>
> I got in my car, pulled out to start my drive home, and went to open my bottle of kombucha.
>
> **Can you say EXPLOSION!**
>
> In case you need a visual of the liquid explosion!
>
> Kombucha was spewing out of the glass bottle and spraying up all over me and my car. Plus, I was still trying to drive. It's amazing that I didn't get in a wreck, but luckily I came to a red light and was able to maneuver the lid back onto the bottle to contain the combustion. I drove the rest of the way home sitting in a big, wet diaper of kombucha. As thirsty as I was, I was not going to open that bottle again and risk another blowout.
>
> Yes, I had been warned not to shake the bottle. The bottle even has a plastic cap cover with the following friendly warning: naturally effervescent – careful when opening. That my friends, is the biggest product understatement I've heard in quite a while.

***GT's you may want to beef up the warning here!***

After cleaning up the pool of liquid, I took the possessed bottle into the house and told my husband the story behind my green bath. At this point we were both a little leery of drinking something that had that much gassy, fizzy power to it. I started to conjure up visions of Charlie drinking the fizzy lifting drinks in *Willie Wonka and the Chocolate Factory*. Surely, no good could come from this.

The experience in my car had left no room in my imagination for what this liquid had the potential to do inside my digestive tract.

After letting the bottle set for a good hour the curiosity got the best of us, and we decided it was safe to open again and each did a shot to see if we would survive.

We did, and I have to admit, even though I never experienced the mushroom buzz, I am a fan of the Kombucha . I like the taste, a cross between sparkling apple cider and champagne, and I like the way it makes me feel. But I'll never shake it up like a Polaroid again!

I've since learned that kombucha is made by fermenting tea using yeast and bacteria, which forms a kombucha culture. This culture is what is affectionately referred to as the mushroom. I guess it really is a magic mushroom if it produces a drink that can energize my mind, fight off the effects of aging with anti-oxidants, and boost my immune system.

So, what's your kombucha confession? Let me know if you've tried it, what brands or flavors you like best, if you're adventurous enough to make you own, and how to remove the kombucha smell from a car interior!" [emphasis added]

http://dailydownwarddog.com/confessions-of-a-kombucha-virgin/

52. On February 9, 2013, at 7:58 a.m. Garry Spedding, P.H.D. of Brewing and Distilling Analytical Services, posted the following blog on his firm's website:

"***These are interesting products along with Kombucha and similar beverages. Our job is to test such beverages and, even though the companies marketing Chia beverages cover themselves with a broad statement "must be kept chilled", the public needs to be aware of the potential alcohol content in such beverages (which in the case of Kombuchas are still on the market with up to 1.5% alcohol by volume) but also over carbonation and bottle rupture.***

***We have tested beverages that have been opened and then left for potential consumption later – one alarming issue is going to be with Chia drinks. When opened and allowed to warm up the continued fermentation (or excessive carbon dioxide gas expansion) causes the seeds to swell to 5 to 10 times their internal size and we have witnessed several (recapped) bottles explode violently in our testing facilities when warmed to room temperature***. The concern is if anyone enjoys a beverage such as these on a warm day, reseals the bottle and forgets about it – the next day is sufficient for

> anyone picking up that bottle to be hurt in a catastrophic glass rupture (my concern is for a child picking it up or being asked to dispose of it). One of our staff can attest to how violently one blew in his (protected) hands. We are now testing for alcohol content in such (Chia) beverages but do note, from continued testing, that many Kombucha manufacturers have no idea as to the alcohol content in these so-called non-alcoholic beverages (the no alcohol statement now conveniently left off the label since the TTB initially recalled all Kombucha from the shelves). Furthermore, with such beverages – several instances are incorrectly reporting the sugar content and I think we are seeing a burgeoning field of entrepreneurs having such products made for them with little to no understanding of the composition, dangers and safety of such beverages. The public are not seeing truth in advertising in our opinion (and as these are marketed through health food chains children may be exposed to quite high amounts of alcohol). While I wish these companies well there needs to be more careful scrutiny of their claims on such beverages. ***In the case of Chia – after what we witnessed in our laboratory – this product might lead to serious injuries without more specific warnings – a disaster waiting to happen! More regulation is needed in this burgeoning industry***." [emphasis added]

http://www.alcbevtestingnews.blogspot.com/search?updated-max=2013-04-10T19:56:00-07:00&max-results=7&start=14&by-date=false

53. On February 9, 2013, at 9:28 a.m. Evan Coppage posted the following response to Mr. Spedding's blog post set forth in paragraph 52 *supra*:

> "I attest. Two different bottles exploded in the lab. I cleaned up chia seeds that were sprayed in a 10 foot radius!"

http://www.alcbevtestingnews.blogspot.com/2013/02/alcoholic-kombucha-exploding-chia.html#comment-form

54. On June 7, 2013, at 11:49 a.m. WinterMoonlight posted the following review of Defendants' Kombucha on Amazon.com:

> "Your rant on carbonation makes no sense. ***The one I opened today nearly exploded out of my hand***. Exactly how much carbonation does one need? You sound like some junkie that needs a fix. And why did you leave your comment under the GT's brand, when you mention Synergy's brand name in the second paragraph? This isn't a helpful review, just a statement of your personal preferences. If you need more bubbles, buy a twin pack of Sodastream carbonating bottles here on Amazon." [emphasis added]

http://www.amazon.com/review/R2MBFDR77MMZSI/ref=cm_cr_pr_viewpnt#R2MBFDR77MMZSI

55. On June 18, 2013, at 2:33 p.m. K. Marvin posted the following review of Defendants' Kombucha on Amazon.com:

> "We buy it for 1/2 the price you see here, at our local store. It's very carbonated most of the time but I have gotten some bottles where the seal has maybe gone bad (I see it leaking) and it's flat. Usually I can't even open it in my car because it makes a huge mess from bubbling over!"

http://www.amazon.com/review/R2MBFDR77MMZSI/ref=cm_cr_pr_viewpnt#R2MBFDR77MMZSI

56. On August 30, 2012, Paul Schlacter posted a video on YouTube of the opening of one of Defendants' Kombucha drinks and exploding with the following commentary:

> "Am I the only one to have GT's Chia drinks explode all over the place???. What an incredible mess! After having one explode in my car, I bought another one and filmed the opening of the bottle. It looks like disgusting slushy puking out of the bottle. Awful."

57. UncleBobbyjr posted the following response to Paul Schlacter on YouTube:

> "It's happened to me twice. They were both the grape chia seeds flavor…"

58. Nick95playa posted the following response to Paul Schlacter on YouTube:

> "Opened the kombucha trilogy. It exploded in the wholefoods and then another one at home. Its common with certain flavors."

59. Migit128 posted the following response to Paul Schlacter on YouTube:

> "***Thats nothing compared to what just happened to me…It's on three of the 4 kitchen walls, my face, and all over my clothes right now. I dont understand how the glass bottle didn't shatter in my hand***." [emphasis added]

60. On October 23, 2012, Jennifer Boyle posted the following on Defendants' Facebook webpage:

> "Any hints on how to open the bottle. I have had 5 coworkers all try to open my Gingerade and we CAN'T physically open the bottle."

www.facebook.com/GTsSynergyKombucha

61. On October 23, 2012, at 6:16 p.m. Pat James posted the following on Defendants' Facebook webpage:

> "I would like an answer to this question as well. I have had 3 bottles that no one has been able to open, very disappointing. Several that I could not open myself and had to get help."

www.facebook.com/GTsSynergyKombucha

62. On October 24, 2012, at 5:04 p.m. Defendants' posted the following on their Facebook webpage in response to Pat James' posting set forth in paragraph 61 *supra*:

> "EEEK! We are so sorry for the inconvenience…kindly contact us at 877-735-8423 or info@gtskombucha.com and we will make things right :-)"

www.facebook.com/GTsSynergyKombucha

63. On November 1, 2012, at 7:32 p.m. Deidra Rowe posted the following on Defendants' Facebook webpage:

> "They are so hard to open. I work at an elementary school and our custodian actually got one of her tools to finally get it opened! Have been drinking GT kombucha regularly for almost 2 months and I love it! Just wish I could open them!"

www.facebook.com/GTsSynergyKombucha

64. On December 1, 2012, Bobby Brown posted the following on Defendants' Facebook webpage:

> "I've had two grape chia seeds explode on me. I've talked to two other people that have experienced this as well. Anyone else out there having this issue. There's nothing more disappointing than being ready to enjoy my kombucha only to have it explode like a bomb and chia seeds end up all over my kitchen wall."

www.facebook.com/GTsSynergyKombucha

65. On December 3, 2012, at 3:09 p.m. Defendants' posted the following on their Facebook webpage in response to Bobby Brown's posting set forth in paragraph 64 *supra*:

> "Hello Bobby, we are so sorry to hear about this! We would like to resolve this matter asap and invite you to call or email us at your convenience: 877-735-8423 or info@gtskombucha.com."

www.facebook.com/GTsSynergyKombucha

66. On March 13, 2013, at 11:10 a.m. Tatiana Gotts posted the following on Defendants' Facebook webpage:

> "This is not acceptable and should be fixed if you want to retain your customers. We have been buying GT's kombucha for years and this week we purchased about 6 bottles and none can be opened. I am going to return them all to Whole Foods. I don't think a drink should have to [sic] pried open with a monkey wrench."

www.facebook.com/GTsSynergyKombucha

67. On March 16, 2013, at 8:24 p.m. Reiner Wishart posted the following on Defendants' Facebook webpage:

> "I also have been unable to open my bottles (hence why I googled and found this post). ***I have found a way which is unfortunate and possibly dangerous, but I take a small knife with a point, hold the bottle steady, and stab the lid in the middle***…." [emphasis added]

www.facebook.com/GTsSynergyKombucha

68. On December 22, 2013 at 10:48 a.m. Amanda C. Bromberg posted the following on Defendants' Facebook webpage:

> "***This has happened to me twice now recently as well- completely like a bomb and pretty scary when you're not expecting it. Second time I saw the signs and brought it into the bathtub to open, so the cleanup was contained. But the first one exploded all***…" [emphasis added]

www.facebook.com/GTsSynergyKombucha/

69. On March 22, 2013, at 5:03 p.m. Flori Manning posted the following on Defendants' Facebook webpage:

> "Same thing here. For the past several months, it's been hellish to get them to open. What's goin on guys?"

www.facebook.com/GTsSynergyKombucha

70. On December 22, 2013, at 5:44 p.m. Alexis Deeg posted the following on Defendants' Facebook webpage:

> "***Bought 12 Cherry Chias (four at a time) over the last couple of weeks and every SINGLE one exploded. I called the store I bought them from who said they were from different shipments so it couldn't have been that they dropped a box and shook them up***…" [emphasis added]

www.facebook.com/GTsSynergyKombucha

71. On December 22, 2013, at 5:46 p.m. Alexis Deeg posted the following in Defendants' Facebook webpage:

> "And yeah like the user said above, the pressure is pretty intense…The ghist [sic] time it happened I tried to screw the top back I because I was in the process of walking into my job and it popped the cap off, leaving my coat covered in seeds and had me smeller like vinegar. Somethings amiss."

www.facebook.com/GTsSynergyKombucha

72. On January 26, 2014, at 10:58 p.m. Azyz Brah posted a picture of an exploded bottle of Defendants' Kombucha on Defendants' Facebook webpage: www.facebook.com/GTsSynergyKombucha

73. On January 28, 2014, at 11:06 p.m. Ash England posted the following on Defendants' Facebook webpage:

> "***I love the grape chia, and this is the 2nd bottle I can't get the gd cap off of. I'm worried that if it does finally come off it will explode. Wtf mates***?" [emphasis added]

www.facebook.com/GTsSynergyKombucha

74. On January 28, 2014, at 6:58 p.m. Christopher Alan Stanley posted the following on Defendants' Facebook webpage:

> "Hi, today I bought 7 Grape Synergy with chia seeds- Upon opening the glass bottle fizzed everywhere (like a can oh pepsi that has been shaken) and half the bottle was gone. This happened on three of the 7 bottles. Can you explain? The expiration date is 2-2-14"

www.facebook.com/GTsSynergyKombucha

75. On February 4, 2014, Brianna Griebel posted the following on Defendants' Facebook webpage:

> "Soo…I bought this product on a whim. Looks great & I'm obsessed with chia seeds. One problem- I've tried to open it for the past 2 hours with no success and a blister started to form on my right hand. Run it under water you say? Tried that. Use a towel or something to protect my hand and get a better grip on the bottle? Yep, twisted a muscle I didn't know I had. Yelled special words at it in hopes it would unlock it's death grip on itself? Mmmhm…my neighbors are probably wondering what's going on. User error? I friggin hope so. Because I have no idea how in the world you were able to seal this cover so tight that not even the Hulk himself could break into this beautiful bottle of what I hope is pure liquid gold deliciousness. But seriously, you need to share your secret with me because I'd like to drink this without having to use a hammer and nails as if I'm attempting to retrieve coconut juice from the shell one drip at a time."

www.facebook.com/GTsSynergyKombucha

76. On February 6, 2014, at 10:25 a.m. Stephanie Long Priestley posted the following on Defendants' Facebook webpage:

> "I'm forlornly looking at the second bottle of Kombucha that I've purchased, but can't open. The first time I threw it away. Not going to do that again. How do I open this thing?"

www.facebook.com/GTsSynergyKombucha

77. On February 6, 2014, at 11:43 a.m. Carrie Genzel posted the following on Defendants' Facebook webpage:

> "Been having the same problems this week. I've had to ask other people to open my bottles three days in a row, not sure what is going on, I've never had trouble before. I finally put the cap under hot water and then opened with a dish cloth, but it wasn't easy."

www.facebook.com/GTsSynergyKombucha

78. On February 6, 2014, at 2:23 p.m. Defendants' posted the following in their Facebook webpage in response to Stephanie Long Priestley's posting set forth in Paragraph 76 *supra*:

> "Stephanie, we are truly sorry for this inconvenience... We want to make it right! Contact us at info@gtskombucha.com Your patience and support mean the world to us!"

www.facebook.com/GTsSynergyKombucha

79. On February 9, 2014, at 7:56 p.m. Shannon McCully posted the following on Defendants' Facebook webpage:

> "Put on a rubber glove and it seems to grip better."

www.facebook.com/GTsSynergyKombucha

80. On February 9, 2014, Stephanie Long Priestley posted the following on Defendants' Facebook webpage in response to the posting by Shannon McCully set forth in paragraph 79 *supra*:

> "I was afraid to do that, thought it might explode! That would be just my luck..."

www.facebook.com/GTsSynergyKombucha

81. On February 11, 2014, at 2:29 p.m. Autumn Zimmerman posted the following on Defendants' Facebook webpage:

> "I can't open my bottle :(…3RDs tried helping!"

www.facebook.com/GTsSynergyKombucha

82. On February 11, 2014, at 2:31 p.m. Stephanie Long Priestley posted the following on Defendants' Facebook webpage:

> "Hot water is your only chance. If that doesn't do it, contact info@gtskombucha.com ***They know about the problem, but clearly theres a lot of product out there***." [emphasis added]

www.facebook.com/GTsSynergyKombucha

83. On February 17, 2014, at 4:29 p.m. Arlene Avocado posted the following on Defendants' Facebook webpage:

> "Why did your carbonation become so inconsistent? For months now, every bottle (no matter what the flavor) is either dead flat or so bubbly it's impossible to drink within hours of opening."

www.facebook.com/GTsSynergyKombucha

84. On February 18, 2014, at 6:18 p.m. Defendants' posted the following on their Facebook webpage in response to Arlene Avocado's posting set forth in Paragraph 83 *supra*:

> "Hello Arlene ...We keep our Kombucha raw, free of any processing, which means that we do not fore carbonate our kombucha…the effervescence that you have experienced in the past is 100% naturally occurring. Since we choose to keep our Kombucha raw, every bottle will have its own unique personality. We invite you to reach out to our customer service team for more info. Your support means the world to us as does your satisfaction...Contact us here: info@gtshombucha.com"

www.facebook.com/GTsSynergyKombucha

85. On February 23, 2014, Griffin Elizabeth Wilson posted the following on Defendants' Facebook webpage:

> "Have you changed anything with your bottling? In the last 2-3 weeks every bottle I've purchased has been impossible to open! I want to keep buying your kombucha but not if a bottle is going to take 10 minutes to open and leave a blister on my hand ):"

www.facebook.com/GTsSynergyKombucha

86. On February 25, 2014, at 5:34 p.m. Chris Stone posted the following on Defendants' Facebook webpage:

> "I am having difficulty opening your drinks. The ones that are impossible all have 'Enjoy by 03/28/14- 06220*B6' on the caps.
>
> The store I get mine from had ones that expired in Feb. last time I got some, but I could open those. It seems to be this newer batch.
>
> I really can't open my bottle- not even with a monkey wrench."

www.facebook.com/GTsSynergy/Kombucha

87. On February 25, 2014, at 8:16 p.m. Pam Kopechek posted the following on Defendants' Facebook webpage:

> "yeah. seriously my hands hurt."

www.facebook.com/GTsSynergy/Kombucha

88. On February 26, 2014, at 1:55 p.m. Kanya Zillmer posted the following on Defendants' Facebook webpage:

"Seriously I just drilled through the top."

www.facebook.com/GTsSynergy/Kombucha

89. On February 27, 2014, at 12:18 a.m. Chris Stone posted the following on Defendants' Facebook webpage:

"HA! ME TOO! (With a corkscrew bottle opener)"

www.facebook.com/GTsSynergy/Kombucha

90. On February 27, 2014, at 5:29 a.m. Sara Romania Hevesi posted the following on Defendants' Facebook webpage:

"Oh no I can't open my bottle either! I wanted to go buy more but I'm scared they will all have this issue! Has anyone managed to open it and how?"

www.facebook.com/GTsSynergy/Kombucha

91. On February 27, 2014, at 11:55 a.m. Emilee Tracy posted the following on Defendants' Facebook webpage:

"I'm so bummed out that I have to go around asking 3 or 4 people for help opening my bottle of kombucha. It's been across the board for a few weeks, with many different variations. I've skinned my palm a few times straining against the bottle. What is going on?! PLEASE FIX THIS!"

www.facebook.com/GTsSynergy/Kombucha

92. On February 27, 2014, at 11:56 a.m. Emilee Tracy posted the following on Defendants' Facebook webpage:

"As a side note, I am not a weak person. The last bottle I struggled with took two coworkers and finally a 250lb man to finally open it. And it took him several minutes too."

www.facebook.com/GTsSynergy/Kombucha

93. On February 27, 2014, at 12:05 p.m. Robin Moore posted the following on Defendants' Facebook webpage:

"I've had to use a vice grip on the past 4 bottles and grip strength is not one of my weaknesses."

www.facebook.com/GTsSynergy/Kombucha

94. On February 27, 2014, at 1:51 p.m. Defendants' posted the following on their Facebook webpage in response to Emilee Tracy's postings set forth in Paragraphs 91-92 *supra*:

> "Hello :-) GTs Synergy Kombucha We are so sorry for your experience! Kindly reach out so that we may make this right. info@gtskombucha.com. We truly thank you for reaching out!"

www.facebook.com/GTsSynergy/Kombucha

95. On February 27, 2014, at 1:53 p.m. Defendants' posted the following on their Facebook webpage in response to Sara Romania Hevesi's posting set forth in Paragraph 90 *supra*:

> "Hello :-) We are so sorry for your experience! Kindly reach out so that we may make this right: info@gtskombucha.com. We truly thank you for reaching out!"

www.facebook.com/GTsSynergy/Kombucha

96. On February 27, 2014, at 3:42 p.m. Carolyn Kingsley posted the following on Defendants' Facebook webpage:

> "Have you guys changed packaging recently? The last few bottles I've purchased (all from Whole Foods in Plano, TX) have been impossible to open! Not enjoying spending 30 minutes trying to open a bottle only to end up with scrapes and calluses..."

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

97. On February 28, 2014, at 4:25 p.m. Defendants posted the following on their Facebook webpage in response to the Carolyn Kingsley's posting set forth in Paragraph 96 *supra*:

> "Hello Carolyn! We are sorry for your experience! Kindly contact our customer service team so that we may make this right: info@gtskombucha.com. They are expecting you and will welcome you with open arms. We truly thank you for reaching out!"

www.facebook.com/GTsSynergy/Kombucha

98. On March 4, 2014, at 12:21 p.m. Laura Michelle Serafine posted the following on Defendants' Facebook webpage:

> "***Guys, I love your product. The chia seed ones are my favorite…but I cannot open them. I am not particularly weak. I have had many people try to open them with no success. Is there some trick? My hands are RAW from trying***..." [emphasis added]

www.facebook.com/GTsSynergy/Kombucha

99. On March 4, 2014, at 5:00 p.m. Karen Terra posted the following on Defendants' Facebook webpage in response to the posting listed in Paragraph 98 *supra*:

> "***Yes. I was just about to send them a message. Over the last couple weeks I've noticed the chia seed bottles have been difficult to open. I've been able to open a couple after a long struggle.***

***But I have two bottles right now that are impossible to open. I am going to return them***." [emphasis added]

www.facebook.com/GTsSynergy/Kombucha

100. On March 4, 2014, at 5:06 p.m. Laura Michelle Seafine posted the following on Defendants' Facebook webpage:

"I have tried the hot water and still no luck... I just cant get them open at all!!..."

www.facebook.com/GTsSynergy/Kombucha

101. On March 6, 2014, at 10:26 a.m. Vincent Beggs posted the following on Defendants' Facebook webpage in response to Defendants' request to contact them listed in Paragraph 78 supra:

"***Rather than asking us to contact customer service, maybe you could let us know what you are doing about the problem. If there is a trick to opening the bottles, share it publicly. If there is a fix in the works, please let us know. Clearly there is a prevalent issue here and as a relatively strong 200lb man who struggles opening these bottles lately, I am going to stop purchasing what is otherwise a fantastic product of this issue."*** [emphasis added]

www.facebook.com/GTsSynergy/Kombucha

102. On March 6, 2014, at 5:02 p.m. Dora Jenner posted the following on Defendants' Facebook webpage in response to the posting listed in Paragraph 96 *supra*:

"***Apparently people at GT's don't care enough to respond to all of these complaints about a tight bottle. I've almost killed myself trying to open these bottles. Its been going on for over a month now across 20+ bottles I bought. Terrible and terrible customer response to this major issue.***" [emphasis added]

www.facebook.com/GTsSynergy/Kombucha

103. On April 21, 2014, Jade Swikert posted the following on Defendants' Facebook webpage:

"Why are these bottles nearly impossible to open."

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

104. On April 21, 2014, in response to Jade Swikert's posting set forth in paragraph 103 *supra*, Defendants posted the following reply on their Facebook webpage:

"Hello Jade, much gratitude for reaching out! WE apologize for this inconvenience and invite you to contact us at info@gtkombucha.com so that we can make this right for you."

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

105. On April 21, 2014, Tory Gallagher posted the following on Defendants' Facebook webpage in response to the posting set forth in Paragraph 104 *supra*:

> "Awesome! I will be contacting you too. I couldn't open my kombucha (it was SO tight) so I tried a wrench and it shattered the bottle ha..."

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

106. On April 22, 2014, Andrew Perry posted the following on Defendants' Facebook webpage:

> "The caps on your bottles are so tight I nearly dislocated my finder getting it open. This is not an isolated incident pretty much since you guys came out of the alcohol fiasco this has been an issue what gives?"

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

107. On May 31, 2014, username Sue posted the following on inmytummy.com:

> "I am super allergic to alcohol, my heartrate goes up to almost 200 on a few sips of beer or wine and way way less than a shot of any hard liquor- my face is flushed, I can feel the blood pumping through my fingertips and toes…When I first had the synergy kombucha, about 1/3 of the way in, I was like, there's so much alcohol in this, I feel woozy, I can feel my heart pumping blood, I can't believe there's no warning and anyone can drink them!"

www.inmytummy.com/2013/02/14/classic-vs-enlightened-gts-synergy-kombucha/

108. On June 9, 2014, Gabriel Garcia posting the following on Defendants' Facebook webpage:

> "im sitting here getting lit up on some original formulas! man these things have a high alcohol content!!! it really soothes a broken heart!"

www.facebook.com/GTsSynergy/Kombucha

109. On June 24, 2014, Joseph Kuehner posted the following on Defendants' Facebook webpage:

> "Are these carbonated? Mine exploded everywhere on the wall all over my counter all the way to my shower curtain! WTF!"

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

110. On June 24, 2014, in response to Joseph Kuehner's posting set forth in paragraph 109 *supra*, Defendants posted the following reply on their Facebook webpage:

> "We are so sorry to hear about this! We would appreciate the opportunity to learn more so that we can make it right. Email info@gtskombucha.com"

www.facebook.com/?sk=welcome#!GTsSynergy/Kombucha

111. On July 11, 2014, Lulu Chang posted the following article on www.bustle.com entitled "Yup, Those GT's Kombucha Drinks Are Alcoholic, And They're Not the Only Ones."

http://www.bustle.com/articles/31353-yup-those-gts-kombucha-drinks-are-alcoholic-and-theyre-not-the-only-ones

112. As set above, the DEFECTS contained in Defendants' kombucha are widespread, result in ongoing loss of product and therefore economic loss, and not uncommonly result in damage to bottles that leak or explode, all of which poses a significant economic harm and potential for danger to the public. Such risk of harm is not academic. In a separately filed action of LEYVA v MILLENNIUM et al, filed in Superior Court of California, County of Sacramento, a consumer was injured with cuts to her neck caused by a bottle of defendants' kombucha that literally exploded due to carbonation pressures, causing a need for emergency medical care and stitching. The consumer was left with scars from the incident, reflecting the real-world hazards posed by the combined risk of the SECONDARY FERMENTATION and the packaging defendants elect to use to sell their kombucha products.

## ACTION ALLEGATIONS

113. Plaintiffs bring this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The class which they seek to represent is defined as:

> "All consumers in the United States who purchased at retail for personal, family or household purposes, and not for resale, within two years before the date this suit was filed, any of the kombucha products manufactured by Defendants."

114. Persons excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants have a controlling interest and their legal representatives, assigns, of Defendants and Defendants' current or former employees, officers, and directors; (c) all persons who properly execute and file a timely request for exclusion from the class or are currently in litigation with Defendants and; (d) the legal representatives, successors or assigns of any such excluded persons.

115. Plaintiff proposes that the Class be divided into subclasses if and as necessary to align class interests.

116. Plaintiff reserves the right to re-define the class or subclasses prior to class certification.

117. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can establish the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

118. **Numerosity- Federal Rule of Civil Procedure 23(a)(1)**: The exact number of class members is unknown and is not available to Plaintiff, but it is clear that individual joinder of all class members is impracticable. The precise identities, numbers, and addresses of the members of the class is unknown to Plaintiff may and should be known with proper and full discovery of Defendants, third parties, and their respective records including, but not limited to, a search of consumer complaints to info@gtskombucha.com.

119. **Commonality and Predominance- Federal Rule of Civil Procedure 23(a)(2)**: There is a well-defined commonality of questions of fact and law that exist as to all class members and predominate over the questions affecting only individual members. These common questions of fact and law include:

a) Whether the Defendants' unfairly, unlawfully, and/or deceptively manufactured, marketed, and/or distributed kombucha knowing that the products contained harmful DEFECTS including, but not limited to:

1) kombucha beverages that, due to the SECONDARY FERMINTATION process, explode once the carbon dioxide levels in the bottle exceeds the pressure tolerance of the bottle and/or cap causing damage and/or loss of product;

2) kombucha beverages that, due the SECONDARY FERMENTATION process, leak from the cap once the carbon dioxide levels in the bottle exceeds the pressure tolerance of the cap causing damage and/or loss of product;

3) kombucha beverages that, due to the SECONDARY FERMENTATION process, are under so much pressure that when the bottle is opened a

majority of the product uncontrollably sprays out causing damage and/or loss of product; and/or

4) kombucha beverages that, due to the SECONDARY FERMENTATION process, have the caps on so tight that the bottle cannot be safely opened.

5) Kombucha beverages that, due to the SECONDARY FERMINATION process, contain alcohol in excess of 0.5% and are not properly labeled as such in violation of both State and Federal law;

b) Whether Defendants knew or should have known about the DEFECTS contained the kombucha that they manufacture, market, and distribute;

c) Whether Defendants concealed from consumers and/or failed to reasonably and adequately disclose to consumers the DEFECTS contained in the kombucha that they manufacture, market, and distribute;

d) Whether Defendants have acted or refused to act on grounds generally applicable to the classes;

e) Whether Defendants knew or became aware of the DEFECTS, yet continued to manufacture, market, and distribute the kombucha without adequately and reasonably informing consumers and purchasers of the material DEFECTS;

f) The amount of revenues and profits Defendants received as a result of manufacturing, marketing, and distributing kombucha that contain DEFECTS;

g) Whether Plaintiffs and Class Members are entitled to restitution, disgorgement of profits, or other equitable relief to remedy Defendant's unfair, unlawful and/or fraudulent business practices;

h) Whether Plaintiffs and Class Members are entitled to recover compensatory, exemplary, trebled, statutory or punitive damages based on Defendants' fraudulent, illegal, conduct or practices and/or or otherwise; and

i) Whether Plaintiffs and Class Members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

120. **<u>Typicality- Federal Rules of Civil Procedure 23(a)(3)</u>**: Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise our of the Defendants' conduct manufacturing, marketing, advertising, distributing, and selling kombucha products that contain DEFECTS. In addition, Plaintiffs' claims are typical of the Class Members in that they would not have purchased Defendants' kombucha and/or would have taken adequate precautions to prevent the uncontrollable SECONDARY FERMENTATION process that proximately caused the DEFECTS which further caused injury to Plaintiff and the members of the class. Thus, Plaintiffs and class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class Members were caused directly by Defendants' wrongful conduct in violating the law as alleged.

121. **<u>Adequacy of Representation- Federal Rules of Civil Procedure 23(a)(4):</u>** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

122. **<u>Superiority- Federal Rules of Civil Procedure 23(b)(3)</u>**: A class action is superior to other available methods for the fair and efficient adjudication of the controversy, and will create a substantial benefit to both the public and the courts in that:

a) Costs of prosecuting the action individually will vastly exceed the costs for prosecuting the case as a class action;

b) Class certification will obviate the necessity of a multiplicity of claims;

c) It is desirable to concentrate the litigation of these claims in a single forum;

d) Unification of common questions of fact and law into a single proceeding before this Court will reduce the likelihood of inconsistent rulings, opinions, and decisions;

e) A class action is a superior means of fairly and efficiently resolving this dispute. Given the complexity of the issues presented here, individual claims are not sufficiently sizeable to attract the interest of highly able and dedicated attorneys who will prosecute them on a contingency basis. A class action is therefore essential to prevent a failure of justice.

123. Individual litigation of the legal and factual issues raised by the conduct of the Defendants would increase delay and expense to all parties and to the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale and comprehensive supervision by a single court.

124. The court may be requested to also incorporate subclasses of Plaintiffs in the interest of justice and judicial economy.

125. In the alternative, the class may be certified because

a) The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudication with respect to the individual class members which would establish incompatible standards of conduct by defendant;

b) The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c) Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole.

126. Class certification is appropriate because Defendants have engaged in uniform and common practice. All class members have the same legal right to and interest in redress for damages associated with the DEFECTS contained in Defendants' kombucha products

127. All conditions precedent for the filing of this action have been met.

**FIRST COUNT: BREACH OF CALIFORNIA CONSUMER WARRANTY ACT**

**BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

128. All prior paragraphs are incorporated here by reference as though fully stated.

129. Plaintiffs, and each of them, were consumers who, within the relevant statute of limitations purchased one or more bottles of kombucha manufactured and distributed by the defendants.

130. At the time of the subject kombucha sales, the defendants were in the business of selling goods, including the subject komucha to retailers for retail sale.

131. The subject kombucha violated the California Consumer Warranty Act because, *inter alia:*

a. The product was not of the same quality as those generally acceptable in the trade because the product was packaged in a substandard fashion that led to widespread spoilage, leaking, and property damage, and because the product was adulterated or similarly contaminated due to ongoing biological processes in the product which resulted in the presence of undesirable and unusual ingredients not labeled or desired by consumers, including but not limited to alcohol and unsafe levels of carbonation;

b. The product was not fit for the ordinary purposes for which such goods are typically used because they were unreasonably unsafe to open, subject to spoilage, posed an injury or property damage hazard, and were adulterated or similarly contaminated as alleged herein.

c. The product was not adequately contained, packaged, and labeled, as alleged herein. This includes but is not limited failure to use proper containers, seals, and lids to prevent leaking, exploding, and spoilage. This also includes but is not limited to failure to properly provide adequate labeling regarding storage, property damage hazards, and the presence of adulterating substances (including but not limited to alcohol) caused by the biological processes alleged herein. Given the scope and potential seriousness of the product defects alleged herein, adequate labeling should have included further and clear admonishment concerning high pressure, leakage, and potential for adulteration from SECONDARY FERMENATION or some similar cautionary language.

132. Plaintiffs, and each of them are entitled to equitable relief, as well as costs of litigation and attorney's fees (Civil Code 1794). Plaintiffs request restitution and injunctive relief. Injunctive relief is warranted because the defendants in this matter have been on notice for years of the problems giving rise to this litigation. Despite regulatory involvement, prior litigation, and ongoing consumer complaints, Defendants continue to sell the subject products without modifying the packaging and/or labeling. Injunctive relief is available as equitable relief under Civil Code 1794, and would allow the court to order Defendants to make reasonable

modifications to avoid this ongoing problem. On information and belief, Plaintiffs assert that the expert information to be exchanged in this matter, much of which has already been obtained through pre-filing forensic investigation and laboratory testing, will provide the court with discrete and enforceable standards from which to fashion an appropriate injunction.

**SECOND COUNT: VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**

**(BUSINESS AND PROFESSIONS CODE 17200)**

**BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS**

133. All prior paragraphs are incorporated here by reference as though fully stated.

134. Defendants' conduct alleged herein violates the California Unfair Competition Law (Business and Professions Code 17200). The conduct is unlawful and unfair, as alleged below.

135. Defendant's conduct is unlawful in part because it violates California's Sherman Food, Drug and Cosmetic Laws, including Health and Safety Code sections 110545, 110565. These statutes prohibit the sale of food that is adulterated, whether due to flawed production or problems in packing and distribution. Manufacturing, distributing, or selling such food is unlawful. (Health and Safety Code 110620.) In this instant action, defendants' products often spoil due to the conditions in which they are packed and shipped, on account of SECONDARY FERMENTATION and the method of bottling. This results, as noted in the consumer complaints above, in consumers receiving products that are not properly sealed, not safe to open, which are not appropriate for human consumption or spoil as to flavor, and which through ongoing metabolic processes develop substances of a kind and amount, including alcohol, for which the products are not labeled. In addition, the defendants' behavior in unlawful in that it violates California's Fair Advertising Law (Business and Professions Code 17500 et seq) by misleading consumers about the possibility, likelihood or tendency of the products to ferment to the point of having an alcohol content materially above that disclosed on the labeling. Such misleading advertising may be treated as a misdemeanor, underscoring its unlawfulness. This behavior also violates analogous statutes and regulations of the U.S. and other State governments including but not limited to those of the Federal Trade Commission, the Food and Drug Administration, and the Federal Alcohol Administration.

136. Defendants' conduct is unfair in part because they manufacture, distribute, and sell the subject products with the full knowledge of the aforementioned quality and adulteration issues. Doing so regularly deprives consumers of the benefit of the bargain on their purchases because, *inter alia*, the products spill, leak, or spoil in connection with carbonation/metabolic issues, and because they spoil or become unsuitable for drinking due to the development of excess alcohol.

137. Plaintiffs and those similarly situated suffered injuries in fact in that they lost the benefit of the bargain concerning their purchase of the subject kombucha, given that in each relevant instance the consumers paid for a drinkable beverage, but did not receive one.

138. Some Plaintiffs and those similarly situated suffered injury in fact in the form of illness and/or allergic reaction to unwarned-of levels of byproducts/adulterants in the subject kombucha, including but not limited to alcohol.

139. Plaintiffs and those similarly situated suffered economic harm in that they lost the purchase price of the product which was or became undrinkable. Additionally a number of plaintiffs and those similarly situated had bottles of the subject product that spilled, leaked, or "exploded" in such fashion as to damage other property such as purses, handbags, containers, vehicles, etc.

140. Some Plaintiffs and those similarly situated suffered economic harm in the form of treatment costs and consumption of time due to illness and/or allergic reaction to unwarned-of levels of byproducts/adulterants in the subject kombucha, including but not limited to alcohol. Such consumption of time may be characterized as an economic harm where applicable through lost income, use of sick time in connection with employment, or temporary loss of household services. Such treatment costs may include the cost of medications or health care provider consultations in connection with reactions to spoiled/adulterated kombucha.

141. Plaintiffs, and each of them are entitled to equitable relief, as well as costs of litigation. Injunctive relief is authorized by California Business and Professions Code 17203. Plaintiffs request restitution and injunctive relief. Injunctive relief is warranted because the defendants in this matter have been on notice for years of the problems giving rise to this litigation. Despite regulatory involvement, prior litigation, and ongoing consumer complaints, Defendants

continue to sell the subject products without modifying the packaging and/or labeling. Injunctive relief would allow the court to order Defendants to make reasonable modifications to avoid this ongoing problem. On information and belief, Plaintiffs assert that the expert information to be exchanged in this matter, much of which has already been obtained through pre-filing forensic investigation and laboratory testing, will provide the court with discrete and enforceable standards from which to fashion an appropriate injunction.

142. Plaintiffs, and those similarly situated, reserve the right to seek costs, including but not limited to attorney's fees at the conclusion of this matter pursuant to California Code of Civil Procedure 1021.5 (Private Attorney General Act.)

**THIRD COUNT: VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT (BUSINESS AND PROFESSIONS CODE 17200) BY PLAINTIFF LEWIS AND THOSE SIMILARLY SITUATED AGAINST ALL DEFENDANTS**

143. All prior paragraphs are incorporated here by reference as though fully stated.

144. Plaintiffs and those similarly situated seek at the time of the initial filing of this lawsuit injunctive relief and attorney's fees in association with their Consumer Legal Remedies Act claims, reserving the right to amend per statute to seek damages after a notice period. (Civil Code 1782(d).)

145. Plaintiffs and those similarly situated were consumers in California, and purchased defendants' kombucha in California. Defendants were at the time, and continue to be, businesses engaged in the manufacture, distribution, and sale of consumer goods in California, including the subject kombucha. Defendants sold kombucha of the nature complained of herein, a good, to Plaintiffs and those similarly situated in discrete transactions throughout the statute of limitations period.

146. The defendants violated the Consumer Legal Remedies Act, Civil Code 1750 et seq, by the conduct alleged herein, and among other things:

a. Representing that goods have characteristics or ingredients which they do not have in violation of Civil Code 1770(a)(5). At all relevant times, defendants sold and continue

to sell the subject kombucha in glass bottles with a printed label, a plastic cap, and a tear-away plastic cap-cover. Standard verbiage is placed on all of defendant's Millennium kombucha, including the statement, "This product contains a trace amount of alcohol." However, in practice, the subject kombucha, especially but not limited to varieties with raw chia seeds added, continue in the SECONDARY FERMENTATION after they are packaged by Millennium Products. This process of fermentation and generally of ongoing metabolic processes continues through shipping, display, purchase, and customer storage. Although the kombucha labeling does state the product is perishable, it does not indicate anything about the fact that it will ferment and produce alcohol above legal limits (generally 0.05%) if not strictly refrigerated at all times, nor does in indicate that kombucha is stored, shipped, sold, districted, and packaged in a way that often leads to substantial amounts of alcohol being present, rather than just traces. Kombucha, including that at issue in this litigation, generally has a flavor profile that is quite different from other commonly marketed beverages. It is not sweet like soda or iced tea, although it certainly resembles iced tea in visual appearance. It is not neutral like water. Instead, it has a complex and, to many first time consumers, somewhat unusual and off-putting flavor with notes of flavors like vinegar. Because of this, consumers, especially first time consumers, are likely not to note the presence of alcohol or other adulterants produced as a result of the SECOND FERMENTATION occurring after the initial bottling of the product. In this manner, the failure to clearly and openly disclose the actual alcohol content leads to consumers who do not want to consume or purchase alcohol to nonetheless doing so. This is an issue that can affect those who have allergic reactions to alcohol, religious observances governing alcohol use, minors or their parents who are mindful of alcohol use, those with medical or addiction issues, and others who choose to avoid alcohol. Named Plaintiff LEWIS and those similarly situated are in this class. These class members relied upon the labeling of the subject kombucha, including the language taken in its context, which includes small text visually separated from the ingredient list and thereby minimized in import, and the absence of any

warnings to conclude that the product was safely considered non-alcoholic. Within the current food marketplace where allergy warnings are rampant and liberally applied with respect to "trace" substances like nuts, wheat, and dairy, this language employed by Millennium was not sufficient to alert reasonably attendant class members, including but not limited to LEWIS, that a substantial amount of alcohol was present in the beverage. To the contrary, it indicated that only trace amounts were present and thereby misrepresented the characteristics and ingredients in the product. Such misrepresentations were reasonably relied upon, leading LEWIS and those similarly situated to consume the subject kombucha, which they would not have done if proper and forthright disclosure had been made. In this way, the misrepresentation of the characteristics and ingredients of the product were factual and proximate cause of LEWIS and similarly situated plaintiffs consuming the subject beverage and incurring damages.

b. Advertising goods or services with intent not to sell them as advertised in violation of Civil Code 1770(a)(9). The defendants were and are aware of the alcohol content of the subject kombucha based on the many consumer complaints and prior litigation referenced above, as well as by knowledge of their own products and the products' manufacturing, distribution, and sales process. Nonetheless, the defendants sold the subject kombucha with the labelling that it contained only trace amounts of alcohol. Because the defendants were aware this was untrue, they knowingly advertised the kombucha product in a way that was not in keeping with their intent in terms of what they would sell. This was reasonably relied upon by Plaintiff LEWIS and those similarly situated, which resulted in purchase and consumption of the beverage, and attendant injury and damages.

147. At the time of the initial filing of this Complaint, Plaintiff LEWIS and those similarly situated seek injunctive relief in the form of revised labeling or pasteurization techniques in order to prevent consumers from being inadvertently subject to alcohol consumption by the defendants.

148. Plaintiff LEWIS and those similarly situated seek costs and attorney's fees in connection with this cause of action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;
2. For an order appointing Plaintiffs as representatives of the Class and their counsel of record as Class counsel;
3. For an award of restitution to class members or for other such similar equitable relief as the Court may deem appropriate;
4. For an order requiring Defendants to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;
5. For an order enjoining the wrongful conduct alleged herein;
6. For costs;
7. For interest;
8. For attorneys' fees under applicable law; and
9. For such other relief as the Court deems just and proper.

Plaintiffs estimate restitution/equitable relief at $10,000,000 for default judgment/due process purposes, without waiving claim to additional amounts, and understanding the appropriate award for this matter will be determined according to proof.

Respectfully submitted,

Dated: November 11, 2015

**CLAYEO C. ARNOLD, APC**

/s/ Joshua H. Watson
Clayeo C. Arnold, Esq. (CBSN 65070)
Joshua H. Watson (CSBN 238058)

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

______________________________
John A. Yanchunis (Bar No. 324681)
*(Pro Hac Vice Anticipated)*

**DEMAND FOR JURY**

Plaintiffs hereby demand a jury trial.

Dated: November 11, 2015

**CLAYEO C. ARNOLD, APC**

/s/ Joshua H. Watson
Clayeo C. Arnold, Esq. (CBSN 65070)
Joshua H. Watson (CSBN 238058)

**DECLARATION OF VENUE PURSUANT TO CIVIL CODE 1780**

I, Joshua H. Watson, declare the following to be true:

1. I am an attorney licensed to practice in the State of California and before this Court. I practice at the Arnold Law Firm, counsel of record for the named plaintiffs herein. I have personal knowledge of the matters stated in this affidavit based upon my interview and inquiry of my clients and facts related to the filing of this matter.
2. Both of the named plaintiffs in this Complaint state, I believe honestly, that they purchased Millennium kombucha from Whole Foods in San Francisco, California. Therefore the transactions giving rise to this litigation for these plaintiffs took place within the geographic territory of jurisdiction and venue of the court in which this matter is to be filed. Further, Whole Foods, by operating one or more stores in San Francisco, does business in San Francisco. Based on the foregoing, I believe this matter is appropriately filed in the U.S. District Court for Northern California.

The foregoing is true and correct under penalty of perjury. Executed in Sacramento, California on November 11, 2015.

/s/Joshua H. Watson #238058
Joshua H. Watson, Esq.